DANIEL L. WARSHAW (Bar No. 185365)
  *dwarshaw@pwfirm.com*
BOBBY POUYA (Bar No. 245527)
  *bpouya@pwfirm.com*
MICHAEL H. PEARSON (Bar No. 277857)
  *mpearson@pwfirm.com*
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: (818) 788-8300
Facsimile:  (818) 788-8104

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| AmeriTeam Services, LLC; Southeastern Emergency Physicians LLC; Texas Medicine Resources, LLP; Emergency Coverage, LLC; Florida Emergency Physicians Kang & Associates, M.D., LLC; Longhorn Emergency Medicine Associates, P.A.; Mid-Ohio Emergency Services LLC; ACS Primary Care Physicians – Southeast, P.C.; Fremont Emergency Services (Scherr), Ltd.; Texas Physician Resources, LLP; InPhyNet South Broward, LLC; Paragon Contracting Services, LLC; Paragon Emergency Services LLC; ACS Primary Care Physicians Southwest, P.A.; Southeastern Emergency Physicians of Memphis, LLC; and Emergency Services of Oklahoma, P.C., | CASE NO.<br><br>**COMPLAINT FOR DAMAGES**<br><br>**JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | |
| Blue Cross and Blue Shield of Alabama; Anthem, Inc.; Elevance Health, Inc.; Health Care Service Corporation; Cambia Health Solutions, Inc.; CareFirst, Inc.; Caring for Montanans, Inc. f/k/a Blue Cross Blue Shield of Montana, Inc.; Premera Blue Cross d/b/a Premera Blue Cross and Premera Blue Cross Blue Shield of Alaska; Blue Cross Blue Shield | |

of Arizona, Inc.; Usable Mutual Insurance Company d/b/a Arkansas Blue Cross Blue Shield; Blue Cross of California d/b/a Anthem Blue Cross of California; California Physicians' Service d/b/a Blue Shield of California; Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado and Anthem Blue Cross and Blue Shield of Nevada; Anthem Blue Cross and Blue Shield of Colorado; Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield of Connecticut; Highmark, Inc.; Highmark BCBSD, Inc. d/b/a Highmark Blue Cross and Blue Shield Delaware; Group Hospitalization and Medical Services, Inc. d/b/a CareFirst BlueCross BlueShield; Blue Cross and Blue Shield of Florida, Inc. d/b/a Florida Blue; Blue Cross and Blue Shield Healthcare Plan of Georgia, Inc.; Blue Cross and Blue Shield of Georgia, Inc.; Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii; Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho; Regence BlueShield of Idaho, Inc.; Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of Indiana; Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa; Blue Cross and Blue Shield of Kansas, Inc.; Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield of Kentucky; Louisiana Health Service and Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana; Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield of Maine; CareFirst of Maryland, Inc. d/b/a CareFirst BlueCross BlueShield; Blue Cross and Blue Shield of Massachusetts, Inc.; Blue Cross and Blue Shield of Michigan; Blue Care Network of Michigan; BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota; Blue Cross and Blue Shield of Mississippi; HMO Missouri, Inc. d/b/a Anthem Blue Cross and Blue Shield of Missouri; Blue Cross and Blue Shield of Kansas City; Blue Cross and Blue Shield of Nebraska, Inc.; Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue

Cross and Blue Shield of New Hampshire; Horizon Health Care Services, Inc. d/b/a Horizon Blue Cross and Blue Shield of New Jersey; Highmark Western and Northeastern New York Inc.; Anthem HealthChoice Assurance, Inc.; Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield of New York; Blue Cross and Blue Shield of North Carolina; Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota; Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio; Regence BlueCross BlueShield of Oregon; Capital Blue Cross; Independence Blue Cross, LLC; Triple-S Salud, Inc.; Blue Cross and Blue Shield of Rhode Island; Blue Cross and Blue Shield of South Carolina; Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota; BlueCross BlueShield of Tennessee, Inc.; Regence BlueCross BlueShield of Utah; Blue Cross and Blue Shield of Vermont; Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia; Regence BlueShield; Highmark West Virginia, Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia; Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield of Wisconsin; Blue Cross & Blue Shield of Wyoming; and Blue Cross and Blue Shield Association,

Defendants.

Plaintiffs, AmeriTeam Services, LLC, and all entities and subsidiaries within its corporate network, including but not limited to those identified in Exhibit 1; Southeastern Emergency Physicians LLC; Texas Medicine Resources, LLP; Emergency Coverage, LLC; Florida Emergency Physicians Kang & Associates, M.D., LLC; Longhorn Emergency Medicine Associates, P.A.; Mid-Ohio Emergency Services LLC; ACS Primary Care Physicians – Southeast, P.C.; Fremont Emergency Services (Scherr), Ltd.; Texas Physician Resources, LLP; InPhyNet South Broward, LLC; Paragon Contracting Services, LLC; Paragon Emergency Services LLC; ACS Primary Care Physicians Southwest, P.A.; Southeastern Emergency Physicians of Memphis, LLC; and Emergency Services of Oklahoma, P.C., (collectively, "TeamHealth" or "Plaintiffs") bring this action against the independent Blue Cross Blue Shield licensees (referred to herein collectively, as "the Blues")[1] and the Blue Cross and Blue Shield Association ("BCBSA" or the "Association") (collectively "Defendants" or "BCBS Defendants") and allege violations of antitrust laws as follows:

## **INTRODUCTION**

1.      TeamHealth is a physician staffing company that provides outsourced healthcare staffing services to hospitals and other healthcare facilities across the United States. With a network of over 19,000 affiliated physicians, advanced practice clinicians, and operational staff, TeamHealth provides care during critical moments in patients' lives, serving more than 28 million individuals every year. TeamHealth delivers a wide range of services, including emergency medicine, hospital medicine, critical care, anesthesiology, post-acute care, behavioral health, and medical call center support. TeamHealth is or has been, during all times relevant to this Complaint,

---

[1] The term "Blues" refers collectively to all of the Defendants except for Defendant Blue Cross Blue Shield Association.

in-network with the Blues across the country. Many of TeamHealth's patients receive insurance coverage by the Blues or participate in employee benefit plans administered by the Blues. TeamHealth and entities within and throughout its corporate network including but not limited to all subsidiaries, affiliates, joint ventures, and related entities operated during July 24, 2008 to the present ("Relevant Period").

2.      During the Relevant Period, TeamHealth rendered medically necessary healthcare services and submitted claims for reimbursement to the Blues accordingly. However, TeamHealth received payments significantly lower than what they would have been compensated in a competitive marketplace, resulting in financial harm caused by Defendants' conduct. TeamHealth has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

3.      Defendants include the Blue Cross Blue Shield Association and the Blues, along with their affiliated companies. The Blues collectively provide health insurance coverage to approximately 115 million people across the United States through arrangements with more than 1.7 million doctors and hospitals nationwide.[2] BCBSA operates primarily to serve the interests of the Blues and to enable their concerted activities.

4.      Plaintiffs challenge Defendants' explicit agreement to divide the United States into designated "Service Areas" and allocate those geographic markets among the Blues, preventing other Blues from competing in each other's Service Areas (the "BCBS Market Allocation Conspiracy"). Plaintiffs further challenge Defendants' agreement to fix reimbursement rates for services provided by Plaintiffs (the "BCBS Price Fixing Conspiracy").

---

[2] *The Blue Cross Blue Shield System*, BCBS.COM, https://www.bcbs.com/about-us/blue-cross-blue-shield-system (last accessed Feb. 27, 2025).

5.     As part of the BCBS Market Allocation Conspiracy, Defendants agreed that each Defendant would maintain a designated Service Area and that other Blues would not compete outside of their Service Areas. As a result, Plaintiffs have no competitive alternatives and were required to accept the below-market reimbursements set by Defendants.

6.     The Blues are separate entities and potential competitors, and would compete in the absence of the BCBS Market Allocation Conspiracy. BCBSA acknowledges on its own website that the Blues are "independent community-based and locally operated BCBS companies" operating in "exclusive geographic areas." Defendants' agreement to allocate the commercial health insurance markets constitutes a horizontal restraint in violation of Section 1 of the Sherman Act.

7.     The BCBS Market Allocation Conspiracy has substantially diminished competition in the market for healthcare insurance, directly impacting reimbursement rates for Plaintiffs. Because of restricted competition, Plaintiffs were paid much less than they would have been absent the BCBS Market Allocation Conspiracy. By entering into agreements with at least some of the Defendants, Plaintiffs are further subjected to contractual terms that are less favorable than they would be absent the conspiracy. The BCBS Market Allocation Conspiracy constitutes a *per se* or rule of reason violation of Section 1 of the Sherman Act.

8.     Defendants have leveraged their market dominance, secured through the Market Allocation Conspiracy, by engaging in a separate Price Fixing Conspiracy. As part of this scheme, each Defendant has agreed to participate in each national program that the Blues adopt, including the Blue Card Program and the National Accounts Program.

9.     According to the BCBSA, the Blue Card Program links participating healthcare providers and the independent Blue Cross and Blue Shield companies across the country through

a single electronic network for claims processing and reimbursement. The Blue Card Program comes into effect when a subscriber of one of the Defendants receives healthcare services within another Defendant's designated Service Area. Through this system, the discounted reimbursement rates imposed within each Defendant's designated Service Area are applied universally to the benefit of all Blues, without the need for separate negotiation or contracting.

10. The National Accounts Program is similar; it generally applies to employee benefit plans with subscribers in multiple states. The Defendant Blue that administers the employee benefit plan is the Control Plan, and the other Blues in whose Service Areas where the subscribers receive healthcare goods, services or facilities are Participating Plans.

11. These programs and others have been established by a horizontal agreement between and among the Blues. The Blue Card Program is managed by a committee of Blues sitting on the Inter-Plan Programs Committee, which controls the national or Inter-Plan Programs of the Blues. The National Accounts Programs are either established based on horizontal agreements between and among the Blues or managed through the Blue Card Program. The excess profits from these programs are then divided among the Blues.

12. Consequently, Defendants have collectively agreed to fix the prices for healthcare reimbursement across the United States. As a direct result, when Plaintiffs provide medical care to a patient insured by or whose plan is administered by a Defendant from a different Service Area, the reimbursement Plaintiffs receive is significantly lower than would be expected in the absence of this Price Fixing Conspiracy. The BCBS Price Fixing Conspiracy is a *per se* or rule of reason violation of Section 1 of the Sherman Act.

13. Defendants' conduct has caused substantial harm to Plaintiffs. Their agreements have also diminished competition by reducing the choices available to healthcare consumers.

Because of the artificially low reimbursement rates imposed by the Blues, fewer healthcare professionals are able to practice than would otherwise be the case in a competitive market. Additionally, numerous hospitals and healthcare facilities have been forced to shut down, cut back on services, or refrain from expanding to meet patient demand, all because of the Blues' suppressed payment rates. The only parties benefiting from Defendants' anticompetitive conduct are the Defendants themselves. Without injunctive relief, these antitrust violations will persist unchecked, further harming competition and harming healthcare providers.

## JURISDICTION AND VENUE

14.     This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

15.     This Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26., and 28 U.S.C. §§ 1331, 1333(d), 1337(a), and 1367.

16.     This Court has personal jurisdiction over all Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391.

17.     Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. §§ 1391 (b), (c) and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business, or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

18.     The Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) had substantial contacts with the United States, including this District; and/or (c) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of

causing injury to Plaintiffs located in or doing business throughout the United States, including this District.

19.     The activities of the Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

## INTERSTATE COMMERCE

20.     The activities of Defendants that are the subject of this Complaint are within the flow of, and have substantially affected, interstate trade and commerce.

21.     Plaintiffs provide services, supplies, or equipment to persons who reside in other states.

22.     The Blue Card Program constitutes interstate commerce and facilitates transactions related to healthcare services.

23.     Plaintiffs rely on interstate banking networks and purchase a substantial volume of goods and services from vendors across state lines to support the provision of medical care.

## PLAINTIFFS

24.     Plaintiff AmeriTeam Services, LLC is a limited liability company and has its headquarters in Knoxville, Tennessee. AmeriTeam Services, LLC has the right to litigate the claims of all entities within its corporate network, including but not limited to all subsidiaries, affiliates, joint ventures, and related entities, that operated at any time during the Relevant Period. Such entities are set forth, to the best of AmeriTeam Services, LLC's current knowledge, in Exhibit 1 to this Complaint, but may be amended upon discovery of further information.

25.     During the Relevant Period, AmeriTeam Services, LLC rendered medically necessary healthcare services and submitted claims for reimbursement to the Blues accordingly.

However, AmeriTeam Services, LLC and all entities and subsidiaries within its corporate network, including but not limited to those identified in Exhibit 1, received payments significantly lower than they would have been compensated in a competitive marketplace, resulting in financial harm caused by Defendants' conduct. AmeriTeam Services, LLC and all entities and subsidiaries within its corporate network, including but not limited to those identified in Exhibit 1, have therefore been injured, and continues to be injured, in their business and property as a result of the unlawful conduct alleged herein.

26.     Plaintiff Southeastern Emergency Physicians, LLC is a Tennessee professional emergency medicine group practice that staffs emergency departments in Arkansas, Kentucky, Mississippi, North Carolina, and Tennessee. During the Relevant Period, Southeastern Emergency Physicians, LLC rendered medically necessary healthcare services and submitted claims for reimbursement accordingly. However, Southeastern Emergency Physicians, LLC received payments significantly lower than it would have been compensated in a competitive marketplace, resulting in financial harm caused by Defendants' conduct.

27.     Plaintiff Texas Medicine Resources, LLP is a Texas professional emergency medicine group practice that staffs emergency departments in Texas. During the Relevant Period, Texas Medicine Resources, LLP rendered medically necessary healthcare services and submitted claims for reimbursement accordingly. However, Texas Medicine Resources, LLP received payments significantly lower than it would have been compensated in a competitive marketplace, resulting in financial harm caused by Defendants' conduct.

28.     Plaintiff Emergency Coverage, LLC is a Tennessee professional emergency medicine group practice that staffs emergency departments in Georgia, North Carolina, Tennessee, and Virginia. During the Relevant Period, Emergency Coverage, LLC rendered medically

necessary healthcare services and submitted claims for reimbursement accordingly. However, Emergency Coverage, LLC received payments significantly lower than it would have been compensated in a competitive marketplace, resulting in financial harm caused by Defendants' conduct.

29.     Plaintiff Florida Emergency Physicians Kang & Associates, M.D., LLC is a Florida professional emergency medicine group practice that staffs emergency departments in Florida. During the Relevant Period, Florida Emergency Physicians Kang & Associates, M.D., LLC rendered medically necessary healthcare services and submitted claims for reimbursement accordingly. However, Florida Emergency Physicians Kang & Associates, M.D., LLC received payments significantly lower than it would have been compensated in a competitive marketplace, resulting in financial harm caused by Defendants' conduct.

30.     Plaintiff Longhorn Emergency Medicine Associates, P.A. is a Texas professional emergency medicine services group practice that staffs emergency departments in Texas. During the Relevant Period, Longhorn Emergency Medicine Associates, P.A. rendered medically necessary healthcare services and submitted claims for reimbursement accordingly. However, Longhorn Emergency Medicine Associates, P.A. received payments significantly lower than it would have been compensated in a competitive marketplace, resulting in financial harm caused by Defendants' conduct.

31.     Plaintiff Mid-Ohio Emergency Services, LLC is an Ohio professional emergency medicine group practice that staffs emergency departments in Ohio. During the Relevant Period, Mid-Ohio Emergency Services, LLC rendered medically necessary healthcare services and submitted claims for reimbursement accordingly. However, Mid-Ohio Emergency Services, LLC

received payments significantly lower than it would have been compensated in a competitive marketplace, resulting in financial harm caused by Defendants' conduct.

32. Plaintiff ACS Primary Care Physicians – Southeast, P.C. is a Georgia professional emergency medicine group practice that staffs emergency departments in Georgia and South Carolina. During the Relevant Period, ACS Primary Care Physicians – Southeast, P.C. rendered medically necessary healthcare services and submitted claims for reimbursement accordingly. However, ACS Primary Care Physicians – Southeast, P.C. received payments significantly lower than it would have been compensated in a competitive marketplace, resulting in financial harm caused by Defendants' conduct.

33. Plaintiff Fremont Emergency Services (Scherr), Ltd. is a Nevada professional emergency medicine group practice that staffs emergency departments in Nevada. During the Relevant Period, Fremont Emergency Services (Scherr), Ltd. rendered medically necessary healthcare services and submitted claims for reimbursement accordingly. However, Fremont Emergency Services (Scherr), Ltd. received payments significantly lower than it would have been compensated in a competitive marketplace, resulting in financial harm caused by Defendants' conduct.

34. Plaintiff Texas Physician Resources, LLP is a Texas professional emergency medicine group practice that staffs emergency departments in Texas. During the Relevant Period, Texas Physician Resources, LLP rendered medically necessary healthcare services and submitted claims for reimbursement accordingly. However, Texas Physician Resources, LLP received payments significantly lower than it would have been compensated in a competitive marketplace, resulting in financial harm caused by Defendants' conduct.

35.     Plaintiff InPhyNet South Broward, LLC is a Florida professional emergency medicine group practice that staffs emergency departments in Florida. During the Relevant Period, InPhyNet South Broward, LLC rendered medically necessary healthcare services and submitted claims for reimbursement accordingly. However, InPhyNet South Broward, LLC received payments significantly lower than it would have been compensated in a competitive marketplace, resulting in financial harm caused by Defendants' conduct.

36.     Plaintiff Paragon Contracting Services, LLC is a Florida professional emergency medicine group practice that staffs emergency departments in Alabama and Florida. During the Relevant Period, Paragon Contracting Services, LLC rendered medically necessary healthcare services and submitted claims for reimbursement accordingly. However, Paragon Contracting Services, LLC received payments significantly lower than it would have been compensated in a competitive marketplace, resulting in financial harm caused by Defendants' conduct.

37.     Plaintiff Paragon Emergency Services LLC is a Florida professional emergency medicine group practice that staffs emergency departments in Florida. During the Relevant Period, Paragon Emergency Services LLC rendered medically necessary healthcare services and submitted claims for reimbursement accordingly. However, Paragon Emergency Services LLC received payments significantly lower than it would have been compensated in a competitive marketplace, resulting in financial harm caused by Defendants' conduct.

38.     Plaintiff ACS Primary Care Physicians Southwest, P.A. is a Texas professional emergency medicine services group practice that staffs emergency departments in Texas. During the Relevant Period, ACS Primary Care Physicians Southwest, P.A. rendered medically necessary healthcare services and submitted claims for reimbursement accordingly. However, ACS Primary Care Physicians Southwest, P.A. received payments significantly lower than it would have been

compensated in a competitive marketplace, resulting in financial harm caused by Defendants' conduct.

39.     Plaintiff Southeastern Emergency Physicians of Memphis, LLC is a Tennessee professional emergency medicine group practice that staffs emergency departments in Illinois, Indiana, Missouri, and Tennessee. During the Relevant Period, Southeastern Emergency Physicians of Memphis, LLC rendered medically necessary healthcare services and submitted claims for reimbursement accordingly. However, Southeastern Emergency Physicians of Memphis, LLC received payments significantly lower than it would have been compensated in a competitive marketplace, resulting in financial harm caused by Defendants' conduct.

40.     Plaintiff Emergency Services of Oklahoma, P.C. is an Oklahoma professional emergency medicine services group practice that staffs emergency departments in Oklahoma. During the Relevant Period, Emergency Services of Oklahoma, P.C. rendered medically necessary healthcare services and submitted claims for reimbursement accordingly. However, Emergency Services of Oklahoma, P.C. received payments significantly lower than it would have been compensated in a competitive marketplace, resulting in financial harm caused by Defendants' conduct.

41.     Furthermore, based on information and belief, Plaintiffs have also provided necessary and covered medical services to members of various Blue Cross and Blue Shield Plans through the Blue Card Program, for which Plaintiffs have submitted claims. Plaintiffs, however, were compensated at rates far below those expected in a competitive environment. As detailed throughout this Complaint, Plaintiffs have suffered financial harm to business and property as a direct consequence of Defendants' violations of antitrust and conspiracy laws.

42. The License Agreements between and among various Defendants and Plaintiffs contain what Defendants may argue is a binding arbitration provision. Plaintiffs do not believe that these arbitration provisions can or would govern the Federal antitrust claims brought in this lawsuit.

## **DEFENDANTS**

43. Defendant Blue Cross and Blue Shield of Alabama is a health insurance provider that operates under the Blue Cross and Blue Shield trademarks and trade names in Alabama. Blue Cross and Blue Shield of Alabama is the largest healthcare benefits provider in the state, offering coverage to over three million individuals. The company's principal headquarters is located at 450 Riverchase Parkway East, Birmingham, Alabama 35244. Throughout this Complaint, Blue Cross and Blue Shield of Alabama are referred to as "BCBS-AL."

44. Defendant Anthem, Inc. is an Indiana corporation with its corporate headquarters located at 120 Monument Circle, Indianapolis, Indiana 46204. Anthem, Inc., its subsidiaries, including Anthem Insurance Companies, Inc., Anthem Holding Company, LLC, Anthem Holding Corp., Anthem Southeast, Inc., and WellPoint Holding Corp., and its health care insurance companies, are collectively referred to as "Anthem" in this Complaint. Anthem, the largest licensee within the BCBSA, is a publicly-traded, for-profit company. Anthem, by and through its subsidiaries and affiliated companies, operates Blues in fourteen states, including California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin.

45. Defendant Elevance Health, Inc., formerly known as WellPoint, Inc., is an Indiana corporation with its corporate headquarters located at 220 Virginia Avenue, Indianapolis, Indiana 46204. Elevance Health, Inc., and its subsidiaries, Anthem Insurance Companies, Inc., Anthem

Holding Company, LLC, Anthem Holding Corp., Anthem Southeast, Inc., and WellPoint Holding Corp., along with its affiliated healthcare plans, are collectively referred to as "Elevance" in this Complaint. As the largest licensee with the BCBSA network Elevance is a publicly-traded, for-profit entity and is one of the largest health benefits company in the United States, serving more than 47 million members through its network of affiliated health plans. Operating through its subsidiaries and affiliated health plans, Elevance provides healthcare coverage in fourteen states, including California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin.

46. Defendant Health Care Service Corporation, a Mutual Legal Reserve Company, is incorporated in Illinois with its corporate headquarters located at 300 East Randolph Street, Chicago, Illinois 60601. As the largest customer-owned health insurer in the United Stated, Health Care Service Corporation provides coverage to over 23 million members. Health Care Service Corporation operates as Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, Blue Cross and Blue Shield of Texas, and Blue Cross Blue Shield of Montana. Within each of its five service areas, Health Care Service Corporation exerts significant market dominance. For purposes of this Complaint, Health Care Service Corporation and its subsidiaries and affiliated health care plans are collectively referred to as "HCSC."

a. Blue Cross and Blue Shield of Illinois operates as a division of Defendant HCSC and has its principal place of business at 300 East Randolph Street, Chicago, Illinois 60601. It delivers healthcare services to approximately 8.9 million members through different healthcare plans in Illinois. For the purposes of this Complaint, Blue Cross and Blue Shield of Illinois, along

with its subsidiaries and healthcare plans, is collectively referred to as "Blue Cross and Blue Shield of Illinois" or "BCBS-IL."

b.      Blue Cross and Blue Shield of New Mexico operates as a division of Defendant HCSC, with its principal office located at 5701 Balloon Fiesta Parkway Northeast, Albuquerque, New Mexico 87113. It provides health care services to approximately 680,000 members enrolled in various insurance plans across New Mexico. Throughout this Complaint, Blue Cross and Blue Shield of New Mexico, along with its subsidiaries and health care plans, is collectively referred to as "Blue Cross and Blue Shield of New Mexico" or "BCBS-NM."

c.      Blue Cross and Blue Shield of Oklahoma operates as a division of Defendant HCSC, with its principal place of business located at 1400 South Boston, Tulsa, Oklahoma 74119. It delivers health care services to approximately 2.8 million enrollees under various health care plans in Oklahoma. Throughout this Complaint, Blue Cross and Blue Shield of Oklahoma, along with its subsidiaries and health care plans, is collectively referred to as "Blue Cross and Blue Shield of Oklahoma" or "BCBS-OK."

d.      Blue Cross and Blue Shield of Texas operates as a division of Defendant HCSC, with its principal place of business at 1001 East Lookout Drive, Richardson, Texas 75082. It offers health care services to around 10.4 million enrollees through various health plans in Texas. Throughout this Complaint, Blue Cross and Blue Shield of Texas, its subsidiaries, and health care plans are collectively referred to as "Blue Cross and Blue Shield of Texas" or "BCBS-TX."

e.      Blue Cross and Blue Shield of Montana, Inc. is a Montana corporation with its principal headquarters located at 560 North Park Avenue, Helena, Montana 59604. It delivers health care services to approximately 300,000 members enrolled in various insurance plans across Montana. In September 2012, it was announced that Blue Cross and Blue Shield of Montana would

become the fifth member plan of Defendant HCSC, contingent upon approval from the Department of Insurance. This "merger" was subsequently authorized by the Montana Attorney General with conditions on June 27, 2013. Throughout this Complaint, Blue Cross and Blue Shield of Montana, Inc., along with its subsidiaries and health care plans, is collectively referred to as "Blue Cross and Blue Shield of Montana" or "BCBS-MT."

47.     Defendant Cambia Health Solutions, Inc. is incorporated in Oregon with its corporate headquarters located at 200 SW Market Street, Portland, Oregon 97201. Previously known as The Regence Group, Inc., the company officially adopted the name in November 2011. Cambia Health Solutions, Inc. is the largest health insurer in the Northwest and Intermountain Region, serving around 3.4 million members through its subsidiaries and affiliated health plans. Through its subsidiaries—Regence Blue Cross Blue Shield of Oregon, Regence BlueShield, Regence Blue Cross Blue Shield of Utah, and Regence BlueShield of Idaho—Cambria Health Solutions, Inc. exerts market dominance within its states of operation or in certain regions of those states. For purposes of this Complaint, Cambia Health Solutions, Inc., its subsidiaries, and affiliated health care plans are collectively referred to as "Cambia Health" or "Cambia."

48.     Defendant CareFirst, Inc. is incorporated in Maryland with its corporate headquarters located at 1501 South Clinton Street, Baltimore, Maryland 21224. As the largest health care insurer in the Mid-Atlantic Region, CareFirst, Inc., serves around 3.4 million members through its subsidiaries, CareFirst of Maryland, Inc. and Group Hospitalization and Medical Services, Inc. Through its network of subsidiaries and health plans, CareFirst, Inc. maintains market dominance in Maryland, the District of Columbia, and Virginia, or in specific areas within those regions under the shared business name CareFirst BlueCross BlueShield. For purposes of

this Complaint, CareFirst, Inc., its subsidiaries, and affiliated health care plans are collectively referred to as "CareFirst" in this Complaint.

49.     Defendant Caring for Montanans, Inc. f/k/a Blue Cross and Blue Shield of Montana Inc. is a Montana corporation with its corporate headquarters located at 3645 Alice Street, Helena, Montana 59604-4309. When Blue Cross and Blue Shield of Montana, Inc. was sold to Defendant HCSC, certain of its liabilities including certain liabilities relating to litigation, remained with the corporation now known as Caring for Montanans, Inc.

50.     Defendant Premera Blue Cross d/b/a Premera Blue Cross and/or Premera Blue Cross Blue Shield of Alaska is incorporated in Washington with corporate headquarters at 7001 220th SW, Mountlake Terrace, Washington 98043. Premera Blue Cross is the parent organization of multiple subsidiary companies, providing healthcare services to approximately 2.8 million members across Alaska and Washington, excluding Clark County. In Washington, the company operates as Premera Blue Cross, while in Alaska, it does business as Premera Blue Cross Blue Shield of Alaska. For the purposes of this Complaint, Premera Blue Cross, its subsidiaries, and affiliated health plans will be collectively referred to as "Premera Blue Cross" or "Premera."

51.     Defendant Blue Cross Blue Shield of Arizona, Inc. is incorporated in Arizona with its headquarters at 2444 West Las Palmaritas Drive, Phoenix, Arizona 85021. The company serves as the parent organization to several subsidiaries that offer healthcare services to approximately 2 million enrollees across different health plans in Arizona. For the purposes of this Complaint, Blue Cross Blue Shield of Arizona, Inc., along with its subsidiaries and affiliated health plans, is collectively referred to as "Blue Cross Blue Shield of Arizona" or "BCBS-AZ."

52.     Defendant Usable Mutual Insurance Company d/b/a Arkansas Blue Cross Blue Shield is incorporated in Arkansas, with its corporate headquarters at 601 South Gaines Street,

Little Rock, Arkansas 72201. As the largest health insurer in Arkansas, it covers approximately 860,000 enrollees, which accounts for about one-third of the state's population. Arkansas Blue Cross and Blue Shield operates through its subsidiaries and affiliated healthcare plans, which, for the purposes of this Complaint, are collectively referred to as "Arkansas Blue Cross and Blue Shield" or "BCBS-AR."

53.     Defendant Blue Cross of California, doing business as Anthem Blue Cross of California, is a California corporation with corporate headquarters at 21215 Burbank Boulevard, Woodland Hills, California 91367. It is a subsidiary of Anthem Holding Corp., which itself is a subsidiary of Defendant Elevance. Blue Cross of California serves as the parent corporation for multiple subsidiaries that provide healthcare coverage to approximately 8.6 million enrollees, making it the largest health insurance provider in California. For the purposes of this Complaint, Blue Cross of California, along with its subsidiaries and affiliated health plans, is collectively referred to as "Blue Cross of California" or "BC-CA."

54.     Defendant California Physicians' Service, operating under the business name Blue Shield of California, is a California-based corporation with its corporate headquarters at 601 12th Street, Oakland, California 94607. The company oversees several subsidiaries that provide healthcare services to around 4.5 million enrollees under various healthcare plans across California. For the purposes of this Complaint, California Physicians' Service, along with its subsidiaries and affiliated healthcare plans, is collectively referred to as "Blue Shield of California" or "BS-CA."

55.     Defendant Rocky Mountain Hospital and Medical Service, Inc., doing business as Anthem Blue Cross and Blue Shield of Colorado in Colorado and Anthem Blue Cross and Blue Shield of Nevada in Nevada, is a subsidiary of Defendant Elevance. The company is incorporated

in Colorado and has its corporate headquarters at 700 Broadway, Denver, Colorado 80273. It serves as the parent company for multiple subsidiaries, offering healthcare services to members enrolled in various healthcare plans throughout Colorado and Nevada.

56.     Defendant Anthem Blue Cross and Blue Shield of Colorado is the trade name of Defendant Rocky Mountain Health and Medical Service, Inc., a Colorado corporation with its headquarters located at 700 Broadway, Denver, CO 80273. Anthem Blue Cross and Blue Shield of Colorado and its parent, Rocky Mountain Hospital and Medical Service, Inc., are subsidiaries of Defendant Anthem. Anthem Blue Cross and Blue Shield of Colorado, its subsidiaries and affiliated companies, which provide health care financing to more than 1.3 million enrollees, are collectively referred to as "Anthem Blue Cross and Blue Shield of Colorado" or "BCBS-CO."

57.     Defendant Anthem Health Plans, Inc., doing business as Anthem Blue Cross and Blue Shield of Connecticut, is a subsidiary of Defendant Elevance; it is incorporated in Connecticut and has its headquarters at 108 Leigus Road, Wallingford, CT, 06492. Serving as the parent company to multiple subsidiaries, it provides healthcare services to approximately 1.4 million enrollees through various healthcare plans in Connecticut. For the purposes of this Complaint, Anthem Blue Cross and Blue Shield of Connecticut, along with its subsidiaries and health plans, is collectively referred to as "Anthem Blue Cross and Blue Shield of Connecticut" or "BCBS-CT."

58.     Defendant Highmark, Inc. is incorporated in Pennsylvania with its corporate headquarters 1800 Center Street, Camp Hill, Pennsylvania 17011. Acting as the parent organization for multiple subsidiaries, it provides healthcare coverage to approximately 7 million members across Pennsylvania, West Virginia, and Delaware. In 2021, HealthNow New York, Inc. merged with Highmark, expanding its footprint into New York. Following this affiliation,

HealthNow New York, Inc. rebranded as Highmark Western and Northeastern New York Inc., with its New York trade names changing to Highmark Blue Cross Blue Shield of Western New York and Highmark Blue Shield of Northeastern New York. Highmark, Inc. is the successor in interest to defendant Highmark Health Services ("Highmark BCBS"). For the purposes of this Complaint, Highmark, Inc., along with its subsidiaries, affiliates, and healthcare plans, is collectively referred to as "Highmark."

59.     Defendant Highmark BCBSD, Inc. d/b/a Highmark Blue Cross and Blue Shield Delaware is a subsidiary of Highmark, Inc.  It is a Delaware corporation with its corporate headquarters located at 800 Delaware Avenue, Wilmington, Delaware 19801. Highmark BCBSD, Inc., was formerly known as Blue Cross and Blue Shield of Delaware.  It became affiliated with Highmark, Inc. on December 30, 2011 and changed its name to Highmark Blue Cross and Blue Shield Delaware in July, 2012.   The company provides healthcare coverage to approximately 435,000, members across Delaware. For the purposes of this Complaint, Highmark BCBSD, Inc., along with its subsidiaries and healthcare plans, is collectively referred to as "Highmark BCBSD, Inc." or "BCBS-DE."

60.     Defendant Group Hospitalization and Medical Services, Inc., doing business as CareFirst BlueCross BlueShield, provides healthcare services in the District of Columbia, Maryland, and parts of Virginia. It is incorporated in the District of Columbia and operates as a subsidiary of CareFirst, Inc. The company's principal place of business is 10455 Mill Run Circle, Owings Mills, Maryland 21117. For the purposes of this Complaint, Group Hospitalization and Medical Services, Inc., along with its subsidiaries and healthcare plans, is collectively referred to as "CareFirst BlueCross BlueShield."

61.     Defendant Blue Cross and Blue Shield of Florida, Inc., doing business as Florida Blue, incorporated in Florida, has its corporate headquarters at 4800 Deerwood Campus Parkway, Jacksonville, Florida 32246. As the parent organization for various subsidiaries, it provides healthcare coverage to approximately 6 million enrollees in different healthcare plans across Florida. For the purposes of this Complaint, Blue Cross and Blue Shield of Florida, along with its subsidiaries and healthcare plans, is collectively referred to as "Blue Cross and Blue Shield of Florida" or "BCBS-FL."

62.     Defendant Blue Cross and Blue Shield Healthcare Plan of Georgia, Inc., is a health maintenance organization (HMO). This entity is incorporated in Georgia and has its corporate headquarters at 740 W. Peachtree St., Atlanta, Georgia 30308. Through its subsidiaries, Blue Cross and Blue Shield Healthcare Plan of Georgia, Inc. provides healthcare services to roughly 2.1 million enrollees in various healthcare plans across Georgia.

63.     Defendant Blue Cross and Blue Shield of Georgia, Inc., is a health maintenance organization (HMO) and merged into Defendant Blue Cross and Blue Shield Healthcare Plan of Georgia, Inc. This entity is incorporated in Georgia and has its corporate headquarters at 120 Monument Circle, Indianapolis, Indiana 46204. Through its subsidiaries and affiliates, Blue Cross and Blue Shield of Georgia, Inc. provides or provided healthcare services to roughly 2.1 million enrollees in various healthcare plans across Georgia. For the purposes of this Complaint, Blue Cross and Blue Shield of Georgia and Defendant Blue Cross and Blue Shield Healthcare Plan of Georgia, Inc., including their affiliates, subsidiaries, and healthcare plans, are collectively referred to as "Blue Cross and Blue Shield of Georgia" or "BCBS-GA."

64.     Defendant Hawaii Medical Service Association, doing business as Blue Cross and Blue Shield of Hawaii, is a Hawaii corporation with its corporate headquarters located at

818 Keeaumoku Street, Honolulu, Hawaii 96814. As the parent organization of several subsidiaries, it offers healthcare services to more than half of Hawaii's population through various healthcare plans in Hawaii. For the purposes of this Complaint, Hawaii Medical Service Association, along with its subsidiaries and healthcare plans, is collectively referred to as "Hawaii Medical Service Association" or "BCBS-HI."

65.     Defendant Blue Cross of Idaho Health Service, Inc., doing business as Blue Cross of Idaho, is an Idaho corporation with its corporate headquarters at 3000 East Pine Avenue, Meridian, Idaho 83642. As the parent entity of several subsidiaries, it delivers healthcare coverage to more than 600,000 members enrolled in various healthcare plans throughout Idaho. For the purposes of this Complaint, Blue Cross of Idaho Health Service, Inc., along with its subsidiaries and healthcare plans, is collectively referred to as "Blue Cross of Idaho" or "BC-ID."

66.     Defendant Regence BlueShield of Idaho, Inc., a subsidiary of Defendant Cambia Health, is incorporated in Idaho and maintains its corporate headquarters at 1602 21st Avenue, Lewiston, Idaho 83501. Serving as the parent company for multiple subsidiaries, it provides healthcare services to over 296,000 members through different healthcare plans in Idaho. For the purposes of this Complaint, Regence BlueShield of Idaho, Inc., along with its subsidiaries and healthcare plans, is collectively referred to as "Regence BlueShield of Idaho" or "BS-ID."

67.     Defendant Anthem Insurance Companies, Inc., doing business as Anthem Blue Cross and Blue Shield of Indiana, is a subsidiary of Defendant Elevance. This Indiana corporation is headquartered at 120 Monument Circle, Indianapolis, Indiana 46204. It serves as the parent company to various subsidiaries that provide healthcare services to enrollees in different healthcare plans across Indiana. For the purposes of this Complaint, Anthem Insurance Companies, Inc.,

including its subsidiaries and healthcare plans, is collectively referred to as "Anthem Blue Cross and Blue Shield of Indiana" or "BCBS-IN."

68.     Defendant Wellmark, Inc., operating as Wellmark Blue Cross and Blue Shield of Iowa, is a corporation incorporated in Iowa with its headquarters at 1331 Grand Avenue, Des Moines, Iowa 50309. As the parent company of multiple subsidiaries, it provides healthcare coverage to approximately 1.4 million members throughout Iowa. For the purposes of this Complaint, Wellmark, Inc., including its subsidiaries and healthcare plans in Iowa, is collectively referred to as "Blue Cross and Blue Shield of Iowa" or "BCBS-IA."

69.     Defendant Blue Cross and Blue Shield of Kansas, Inc. is a Kansas corporation with corporate headquarters at 1133 SW Topeka Boulevard, Topeka, Kansas 66629. It serves as the parent organization of several subsidiaries, including Premier Health, Inc., delivering healthcare services to approximately 880,000 members through various healthcare plans in Kansas. For the purposes of this Complaint, Blue Cross and Blue Shield of Kansas, including its subsidiaries and healthcare plans, is collectively referred to as "Blue Cross and Blue Shield of Kansas" or "BCBS-KS."

70.     Defendant Anthem Health Plans of Kentucky, Inc., doing business as Anthem Blue Cross and Blue Shield of Kentucky, is a subsidiary of Defendant Elevance and is incorporated in Kentucky with corporate headquarters at 13550 Triton Boulevard, Louisville, Kentucky 40223. For the purposes of this Complaint, Anthem Health Plans of Kentucky, its subsidiaries, and healthcare plans are collectively referred to as "Anthem Blue Cross and Blue Shield of Kentucky" or "BCBS-KY."

71.     Defendant Louisiana Health Service & Indemnity Company, doing business as Blue Cross and Blue Shield of Louisiana, is a corporation based in Louisiana with corporate

headquarters at 5525 Reitz Avenue, Baton Rouge, Louisiana 70809. It serves as the parent company for several subsidiaries, providing healthcare coverage to approximately 1.9 million enrollees under various healthcare plans in Louisiana. For the purposes of this Complaint, Louisiana Health Service & Indemnity Company, including its subsidiaries and healthcare plans, is collectively referred to as "Blue Cross and Blue Shield of Louisiana" or "BCBS-LA."

72. Defendant Anthem Health Plans of Maine, Inc., doing business as Anthem Blue Cross and Blue Shield of Maine, is a Maine corporation and a subsidiary of Defendant Elevance, with corporate headquarters at 2 Gannett Drive, South Portland, Maine 04016. The company operates as the parent entity of multiple subsidiaries, providing healthcare services to about 370,000 enrollees across various healthcare plans in Maine. For the purposes of this Complaint, Anthem Health Plans of Maine, along with its subsidiaries and healthcare plans, is collectively referred to as "Anthem Blue Cross and Blue Shield of Maine" or "BCBS-ME."

73. Defendant CareFirst of Maryland, Inc., doing business as CareFirst BlueCross BlueShield, is a Maryland corporation and a subsidiary of Defendant CareFirst. Its corporate headquarters are located at 1501 South Clinton Street, Baltimore, Maryland 21224. As the parent company of multiple subsidiaries, it offers healthcare services to enrollees in various healthcare plans across Maryland. For the purposes of this Complaint, CareFirst of Maryland, including its subsidiaries and healthcare plans, is collectively referred to as "CareFirst BlueCross BlueShield of Maryland."

74. Defendant Blue Cross and Blue Shield of Massachusetts, Inc. is a corporation incorporated in Massachusetts with corporate headquarters at 101 Huntington Avenue, Suite 1300, Boston, Massachusetts 022199. It serves as the parent entity for multiple subsidiaries, providing healthcare coverage to approximately 2.8 million enrollees in various healthcare plans throughout

Massachusetts. For the purposes of this Complaint, Blue Cross and Blue Shield of Massachusetts, including its subsidiaries and healthcare plans, is collectively referred to as "Blue Cross and Blue Shield of Massachusetts" or "BCBS-MA."

75.     Defendant Blue Cross and Blue Shield of Michigan is a corporation registered in Michigan with corporate headquarters at 600 East Lafayette Boulevard, Detroit, Michigan 48226. It is the parent company of multiple subsidiaries, providing healthcare services to around 5 million enrollees under various healthcare plans in Michigan.

76.     Defendant Blue Care Network of Michigan is a corporation registered in Michigan with corporate headquarters at 600 East Lafayette Boulevard, Detroit, Michigan 48226. It is the parent company of multiple subsidiaries, providing healthcare services to around 5 million enrollees under various healthcare plans in Michigan. For the purposes of this Complaint, Blue Care Network of Michigan and Blue Cross and Blue Shield of Michigan, including their subsidiaries and healthcare plans, are collectively referred to as "Blue Cross and Blue Shield of Michigan" or "BCBS-MI."

77.     Defendant BCBSM, Inc., doing business as Blue Cross and Blue Shield of Minnesota, is a corporation incorporated in Minnesota with corporate headquarters at 3400 Yankee Drive, Eagan, Minnesota 55121. BCBSM, Inc. is wholly owned by Aware Integrated, Inc. and acts as the parent company for various subsidiaries, providing healthcare coverage to about 2.5 million enrollees in Minnesota. For the purposes of this Complaint, BCBSM, Inc., including its subsidiaries and healthcare plans, is collectively referred to as "Blue Cross and Blue Shield of Minnesota" or "BCBS-MN."

78.     Defendant Blue Cross and Blue Shield of Mississippi, a Mutual Insurance Company, is a corporation registered in Mississippi with corporate headquarters at 3545 Lakeland

Drive, Flowood, Mississippi 39232. As the parent entity for multiple subsidiaries, it provides healthcare services to approximately 1 million enrollees under various healthcare plans in Mississippi. For the purposes of this Complaint, Blue Cross and Blue Shield of Mississippi, including its subsidiaries and healthcare plans, is collectively referred to as "Blue Cross and Blue Shield of Mississippi" or "BCBS-MS."

79. Defendant HMO Missouri, Inc., doing business as Anthem Blue Cross and Blue Shield of Missouri, is a Missouri corporation and a subsidiary of Defendant Elevance, with corporate headquarters at 1831 Chestnut Street, St. Louis, Missouri 63103. It functions as the parent company of multiple subsidiaries, delivering healthcare services to approximately 2.1 million enrollees in various healthcare plans in Missouri. For the purposes of this Complaint, Anthem Blue Cross and Blue Shield of Missouri, including its subsidiaries and healthcare plans, is collectively referred to as "Anthem Blue Cross and Blue Shield of Missouri" or "BCBS-MO."

80. Defendant Blue Cross and Blue Shield of Kansas City, Inc. is a Missouri corporation with corporate headquarters at 2301 Main Street, Kansas City, Missouri 64108. It serves as the parent entity for multiple subsidiaries, providing healthcare services to approximately 1 million enrollees in various healthcare plans across Kansas City and its surrounding areas in Kansas and Missouri. For the purposes of this Complaint, Blue Cross and Blue Shield of Kansas City, including its subsidiaries and healthcare plans, is collectively referred to as "Blue Cross and Blue Shield of Kansas City" or "BCBS-Kansas City."

81. Defendant Blue Cross and Blue Shield of Nebraska, Inc. is a Nebraska corporation with its principal headquarters located at 1919 Aksarben Drive, Omaha, Nebraska 68106. The company operates as the parent entity of multiple subsidiaries that offer health care services to more than 700,000 individuals enrolled in various health care plans throughout Nebraska. In this

Complaint, Blue Cross and Blue Shield of Nebraska, along with its subsidiaries and health care plans, is collectively referred to as "Blue Cross and Blue Shield of Nebraska" or "BCBS-NE."

82. Defendant Anthem Health Plans of New Hampshire, Inc., doing business as Anthem Blue Cross and Blue Shield of New Hampshire, is a subsidiary of Defendant Elevance. This New Hampshire corporation is headquartered at 1155 Elm Street, Suite 200, Manchester, New Hampshire 03103. It serves as the parent company of multiple subsidiaries that collectively provide health care services to more than 600,000 members across various insurance plans in New Hampshire. Throughout this Complaint, Anthem Health Plans of New Hampshire, Inc., along with its subsidiaries and health care plans, is collectively referred to as "Anthem Blue Cross and Blue Shield of New Hampshire" or "BCBS-NH."

83. Defendant Horizon Healthcare Services, Inc., doing business as Horizon Blue Cross and Blue Shield of New Jersey, is a New Jersey corporation with its main headquarters at Three Penn Plaza East, Newark, New Jersey 07105. It functions as the parent company of multiple subsidiaries that provide health care services to over 3.8 million members enrolled in various insurance plans throughout New Jersey. In this Complaint, Horizon Healthcare Services, Inc., along with its subsidiaries and health care plans, is collectively referred to as "Horizon Blue Cross and Blue Shield of New Jersey" or "BCBS-NJ."

84. Defendant Highmark Western and Northeastern New York Inc. is a New York corporation with its principal headquarters located at 28 Liberty Street, New York, New York, 10005. The company operates under the business names Highmark Blue Cross Blue Shield of Western New York and Highmark Blue Shield of Northeastern New York. As the parent company of multiple subsidiaries, it provides health care services to individuals enrolled in various health care plans throughout New York. In this Complaint, Highmark Western and Northeastern New

York Inc., along with its subsidiaries and health care plans, is collectively referred to as "Highmark New York."

85.     Defendant Anthem HealthChoice Assurance, Inc., is a subsidiary of Defendant Elevance. This New York corporation has its principal headquarters at 9 Pine Street, 14th Floor, New York, New York 10005, formerly listed as One Liberty Plaza, New York, New York 10006. Previously known as Empire HealthChoice Assurance, Inc. and operating as Empire Blue Cross and Blue Shield, the company underwent a rebranding in January 2024. Anthem HealthChoice Assurance, Inc. serves as the parent company of multiple subsidiaries that provide health care services to nearly 6 million enrollees across various health care plans in New York. Throughout this Complaint, Anthem HealthChoice Assurance, Inc., its subsidiaries, and its health care plans are collectively referred to as "Anthem HealthChoice Assurance."

86.     Defendant Excellus Health Plan, Inc., doing business as Excellus BlueCross BlueShield of New York, is a subsidiary of Lifetime Healthcare, Inc. and a New York corporation with its corporate headquarters at 165 Court Street, Rochester, New York 14647. The company functions as the parent entity of multiple subsidiaries that collectively provide health care services to approximately 1.5 million enrollees in various health care plans throughout New York. For the purposes of this Complaint, Excellus Health Plan, Inc., along with its subsidiaries and health care plans, is collectively referred to as "Excellus BlueCross BlueShield."

87.     Defendant Blue Cross and Blue Shield of North Carolina is a North Carolina corporation with its corporate headquarters at 4613 University Drive, Durham, North Carolina 27707. As the parent company of multiple subsidiaries, it delivers health care services to approximately 4.3 million members across various health care plans in North Carolina. Throughout this Complaint, Blue Cross and Blue Shield of North Carolina, along with its

subsidiaries and health care plans, is collectively referred to as "Blue Cross and Blue Shield of North Carolina" or "BCBS-NC."

88.     Defendant Noridian Mutual Insurance Company, doing business as Blue Cross Blue Shield of North Dakota, is a North Dakota corporation with its principal headquarters at 4510 13th Avenue South, Fargo, North Dakota 58121. The company serves as the parent of multiple subsidiaries that offer health insurance products and related services to over 450,000 members across the Midwest and Western United States. Blue Cross Blue Shield of North Dakota, as a division of Noridian Mutual Insurance Company, provides health care services to approximately 390,000 members enrolled in various health care plans in North Dakota. Throughout this Complaint, Noridian Mutual Insurance Company, doing business as Blue Cross Blue Shield of North Dakota, along with its subsidiaries and health care plans, is collectively referred to as "Blue Cross Blue Shield of North Dakota" or "BCBS-ND."

89.     Defendant Community Insurance Company, doing business as Anthem Blue Cross and Blue Shield of Ohio, is a subsidiary of Defendant Elevance. This Ohio-based corporation has its principal headquarters at 4361 Irwin Simpson Road, Mason, Ohio 45040. It serves as the parent company of multiple subsidiaries that collectively provide health care services to over 4.1 million members across various health care plans in Ohio. In this Complaint, Community Insurance Company, along with its subsidiaries and health care plans, is collectively referred to as "Anthem Blue Cross and Blue Shield of Ohio" or "BCBS-OH."

90.     Defendant Regence BlueCross BlueShield of Oregon is a subsidiary of Defendant Cambia Health. This Oregon-based corporation has its principal headquarters at 200 SW Market Street, Portland, Oregon 97201. As the parent entity of multiple subsidiaries, it provides health care services to over 990,000 members enrolled in various health care plans throughout Oregon.

For the purposes of this Complaint, Regence Blue Cross Blue Shield of Oregon, its subsidiaries, and health care plans are collectively referred to as "Blue Cross Blue Shield of Oregon" or "BCBS-OR."

91.     Defendant Capital Blue Cross is a Pennsylvania corporation with its corporate headquarters at 2500 Elmerton Avenue, Susquehanna Township, Harrisburg, Pennsylvania 17177. As the parent organization of multiple subsidiaries, it offers health care services to approximately 1 million enrollees across various health care plans in Pennsylvania. Throughout this Complaint, Capital Blue Cross, its subsidiaries, and health care plans are collectively referred to as "Capital Blue Cross."

92.     Defendant Independence Blue Cross, LLC is a Pennsylvania corporation with its corporate headquarters at 1901 Market Street, Philadelphia, Pennsylvania 19103. Serving as the parent company to multiple subsidiaries, it delivers health care services to over 3 million enrollees throughout Pennsylvania. In this Complaint, Independence Blue Cross, along with its subsidiaries and health care plans, is collectively referred to as "Independence Blue Cross" or "IBC."

93.     Defendant Triple-S Salud, Inc., a subsidiary of Triple-S Management Company, is a Puerto Rico corporation headquartered at 1441 Avenida F.D. Roosevelt Avenue, San Juan, Puerto Rico 00920. It oversees multiple subsidiaries that collectively provide health care services to more than one million enrollees across Puerto Rico. For the purposes of this Complaint, Triple-S Salud, Inc., along with its subsidiaries and health care plans, is collectively referred to as "Triple-S of Puerto Rico."

94.     Defendant Blue Cross and Blue Shield of Rhode Island is a Rhode Island corporation with its principal headquarters at 500 Exchange Street, Providence, Rhode Island 02903. As the parent entity of several subsidiaries, it offers health care services to approximately

600,000 enrollees through various health care plans in Rhode Island. Throughout this Complaint, Blue Cross and Blue Shield of Rhode Island, its subsidiaries, and health care plans are collectively referred to as "Blue Cross and Blue Shield of Rhode Island" or "BCBS-RI."

95.     Defendant Blue Cross and Blue Shield of South Carolina is a South Carolina corporation headquartered at 2501 Faraway Drive, Columbia, South Carolina 29223. It operates multiple subsidiaries that provide health care services to around 450,000 members across various health care plans in South Carolina. In this Complaint, Blue Cross and Blue Shield of South Carolina, along with its subsidiaries and health care plans, is collectively referred to as "Blue Cross and Blue Shield of South Carolina" or "BCBS-SC."

96.     Defendant Wellmark of South Dakota, Inc., operating as Wellmark Blue Cross and Blue Shield of South Dakota, is a South Dakota corporation with its principal headquarters at 1601 West Madison Street, Sioux Falls, South Dakota 57104. It functions as a subsidiary of Defendant Wellmark, Inc. and serves as the parent organization for multiple subsidiaries that deliver health care services to approximately 400,000 enrollees across South Dakota. For the purposes of this Complaint, Wellmark of South Dakota, its subsidiaries, and health care plans are collectively referred to as "Wellmark Blue Cross and Blue Shield of South Dakota" or "BCBS-SD."

97.     Defendant BlueCross BlueShield of Tennessee, Inc. is a Tennessee corporation headquartered at 1 Cameron Hill Circle, Chattanooga, Tennessee 37402. It oversees several subsidiaries that provide health care services to approximately 3.5 million members enrolled in various health plans across Tennessee. In this Complaint, Blue Cross and Blue Shield of Tennessee, its subsidiaries, and health care plans are collectively referred to as "Blue Cross and Blue Shield of Tennessee" or "BCBS-TN."

98.     Defendant Regence BlueCross BlueShield of Utah, a subsidiary of Defendant Cambia Health, is incorporated in Utah and maintains its corporate headquarters at 2890 East Cottonwood Parkway, Salt Lake City, Utah 84121. Acting as the parent organization to multiple subsidiaries, it facilitates health care services for over 702,000 members in various Utah-based health plans. In this Complaint, Regence Blue Cross Blue Shield of Utah, its subsidiaries, and health care plans are collectively referred to as "Regence Blue Cross Blue Shield of Utah" or "BCBS-UT."

99.     Defendant Blue Cross and Blue Shield of Vermont is a Vermont corporation with its main offices at 445 Industrial Lane, Berlin, Vermont 05602. It manages multiple subsidiaries that provide health care services to approximately 240,000 enrollees in health plans throughout Vermont. For the purposes of this Complaint, Blue Cross and Blue Shield of Vermont, its subsidiaries, and health care plans are collectively referred to as "Blue Cross and Blue Shield of Vermont" or "BCBS-VT."

100.    Defendant Anthem Health Plans of Virginia, Inc., doing business as Anthem Blue Cross and Blue Shield of Virginia, is a Virginia corporation and a subsidiary of Defendant Elevance. Its corporate headquarters is located at 2015 Staples Mill Road, Richmond, Virginia 23230. It serves as the parent company to multiple subsidiaries that provide health care services to approximately 3.4 million enrollees in various Virginia-based health plans. In this Complaint, Anthem Blue Cross and Blue Shield of Virginia, its subsidiaries, and health care plans are collectively referred to as "Anthem Blue Cross and Blue Shield of Virginia" or "BCBS-VA."

101.    Defendant Regence BlueShield is a Washington corporation with its principal headquarters at 1800 9th Avenue, Seattle, Washington 98101. It serves as the parent entity for multiple subsidiaries that deliver health care services to more than 1.5 million members through

various health plans in Washington. In this Complaint, Regence BlueShield, along with its subsidiaries and health care plans, is collectively referred to as "Regence Blue Shield of Washington."

102.     Defendant Highmark West Virginia, Inc., operating as Highmark Blue Cross Blue Shield of West Virginia, is a West Virginia corporation and a subsidiary of Defendant Highmark. Its corporate headquarters are located at 614 Market Square, Parkersburg, West Virginia 26101. Previously known as Mountain State Blue Cross Blue Shield, it functions as the parent company to multiple subsidiaries that provide health care services to approximately 300,000 enrollees in various health plans throughout West Virginia . For the purposes of this Complaint, Highmark Blue Cross Blue Shield of West Virginia, its subsidiaries, and health care plans are collectively referred to as "Highmark Blue Cross Blue Shield of West Virginia" or "BCBS-WV." BCBS-WV maintains market dominance in its service regions across West Virginia.

103.     Defendant Blue Cross Blue Shield of Wisconsin, operating as Anthem Blue Cross and Blue Shield of Wisconsin, is a Wisconsin corporation and a subsidiary of Defendant Elevance. It is headquartered at 401 West Michigan Street, Milwaukee, Wisconsin 53203. The company oversees multiple subsidiaries, including Compcare Health Services Insurance Corporation, providing health care services to approximately enrollees across various Wisconsin-based health plans. In this Complaint, Blue Cross Blue Shield of Wisconsin, its subsidiaries, and health care plans are collectively referred to as "Blue Cross Blue Shield of Wisconsin" or "BCBS-WI."

104.     Defendant Blue Cross & Blue Shield of Wyoming is a Wyoming corporation with its corporate headquarters at 4000 House Avenue, Cheyenne, Wyoming 82001. It serves as the parent company to a range of subsidiaries that provide health care services to around 100,000 enrollees in various Wyoming health plans. Throughout this Complaint, Blue Cross Blue Shield

of Wyoming, its subsidiaries, and health care plans are collectively referred to as "Blue Cross Blue Shield of Wyoming" or "BCBS-WY."

105.     Due to the Market Allocation Conspiracy, many of the Blues have established market dominance across either the entirety or substantial portions of their Service Areas.

106.     Defendant Blue Cross and Blue Shield Association is a corporation incorporated in Illinois, with its headquarters located at 225 North Michigan Avenue, Chicago, Illinois 60601. It is owned and operated by 33 health insurance companies that function under the Blue Cross and Blue Shield trademarks and trade names. Established by these plans, BCBSA operates as the licensing entity for the brand. Collectively, BCBSA-affiliated insurance plans provide coverage to approximately 115 million Americans, equating to one in three U.S. residents, and contract with more than 1.7 million doctors and hospitals. BCBSA does not directly offer healthcare services nor contract with physicians for medical services. Instead, it functions to standardize practices and facilitate coordination among its 33 member plans. It is owned and controlled by its member plans and operates under a board of directors, where at least two-thirds of its members must be either plan CEOs or board members. The 38 affiliated health plans finance Defendant BCBSA.

107.     BCBSA, along with all other Defendants, have substantial connections with the District through their collusion with each other for multiple reasons, including but not limited to the following. First, some of the Defendants, including HCSC through its division BCBS-IL, have entered into contracts with healthcare providers in this District. Second, all Defendants conduct significant business in and maintain contacts with this District, including through the Blue Card Program due to Defendants' subscribers who receive healthcare goods, services and/or treatment in this District. Third, all Defendants have conspired to engage in the anti-competitive conduct as alleged herein with each other, including but not limited to BCBS-IL. Specifically, on information

and belief, Defendants transacted extensive business in the District, involving: (i) individuals residing in this District, but outside of the Service Areas of Defendants, who had their insurance claims processed by Defendants for medical care rendered in this District; (ii) collecting premiums from individual subscribers; (iii) being billed for healthcare services by healthcare providers located in the District, including but not limited to participants in the Blue Card Program; (iv) joining or participating in the Blue Card Program, which operates in the District; and (v) transacting claims-related business with other Defendants located in the District.

108.    This Court also has personal jurisdiction under the conspiracy theory of jurisdiction because Defendants participated in a conspiracy in which at least one conspirator, BCBS-IL, committed overt acts in this District in furtherance of the conspiracy.

## FACTUAL ALLEGATIONS

## I.    THE BCBS DEFENDANTS' STRUCTURE AND AGREEMENTS PERMITTED THEM TO IMPLEMENT THE CONSPIRACY

109.    The Defendants are independent health insurance companies that provide healthcare coverage in all 50 states, the District of Columbia, and Puerto Rico, collectively insuring 115 million Americans. As per BCBSA's statements, over 1.7 million doctors and hospitals across the country have contracts with at least one of the Defendants, making them the largest insurer network in the nation.[3]

110.    The Blues consist of many of the largest health insurance companies in the United States that would otherwise be direct competitors. In the absence of self-imposed restrictions among the independent Blue Cross and Blue Shield licensees, as detailed below, these companies would naturally compete with one another in the commercial health insurance market.

---

[3] *The Blue Cross Blue Shield System*, BCBS.COM, https://www.bcbs.com/about-us/blue-cross-blue-shield-system (last accessed Feb. 27, 2025).

111.     For instance, Elevance, with around 46 million enrollees, is one of the largest members of the Blues by total medical enrollment.[4] It serves as the Blue Cross and Blue Shield licensee for multiple states, including Georgia, Kentucky, parts of Virginia, California (Blue Cross only), Colorado, Connecticut, Indiana, Maine, Missouri (excluding 30 counties in the Kansas City region), Nevada, New Hampshire, New York (as Blue Cross Blue Shield in 10 New York City metropolitan counties and as Blue Cross or Blue Cross Blue Shield in selected upstate areas), Ohio, and Wisconsin. Beyond its Blue-branded plans, Elevance also provides coverage nationwide through its non-Blue subsidiary, UniCare, and participates in Medicaid markets through Amerigroup, rebranded as Wellpoint in January of 2024.[5] Were it not for the unlawful territorial restrictions outlined above, Elevance would likely expand its insurance offerings into additional regions across the country, directly competing with other Blue plans. This competition would lead to higher reimbursement rates for healthcare providers in those areas.

112.     HCSC—which operates BCBS-IL, BCBS-NM, BCBS-OK, BCBS-TX, and BCBS-MT—stands as the largest mutual health insurance company in the U.S. and the fifth-largest[6] health insurer overall, covering over 23 million members.[7] Without the territorial constraints imposed by the Blues, HCSC would likely extend its insurance services to more regions, increasing

---

[4] *Elevance Health (Anthem) Posts a Double-Digit Increase in First Quarter 2024 Profits, Beating Analysts' Expectations*, April 22, 2024, *available at* https://whatleykallas.com/elevance-health-anthem-posts-a-double-digit-increase-in-first-quarter-2024-profits-beating-analysts-expectations/#:~:text=In%20a%20press%20release%20announcing,quarter%20results%20is%20linked%20here (last accessed Feb. 27, 2025).

[5] *Other Health Plans and Companies*, ELEVEANCEHEALTH.COM, https://www.elevancehealth.com/who-we-are/companies/affiliated-companies-and-health-plans (last accessed Feb. 27, 2025).

[6] *The Top Health Insurance Companies Dominating the U.S. Market*, THESTREET.COM, Jan. 17, 2025, *available at* https://www.thestreet.com/retirement-daily/your-money/top-health-insurance-companies-the-u-s-market (last accessed Feb. 27, 2025).

[7] *Who We Are*, HCSC.COM, https://www.hcsc.com/who-we-are (last accessed Feb. 27, 2025).

competition with other Blue plans. This competition and market expansion would drive up payment rates for healthcare providers in those areas.

113.    BCBS-MI ranks as the eighth-largest[8] health insurer in the U.S. based on total medical enrollment, covering approximately 5 million members in its Michigan Service Area. In the absence of the territorial restrictions enforced by the Blues, BCBS-MI would likely expand its health insurance products and services into additional market, which would result in greater competition with other Blues and thereby improve reimbursement rates for healthcare providers in those regions.

114.    Highmark, Inc. covers around 7 million enrollees.[9]  If not for the territorial limitations imposed by the Blues, Highmark would likely enter new markets nationwide, competing with other Blue plans and thereby increasing provider reimbursement rates in those areas.

115.    Blue Cross and Blue Shield of Alabama covers over 2 million Alabamians.[10] Without the unlawful territorial restrictions outlined below, Blue Cross Blue Shield of Alabama would likely expand its health insurance offerings to additional regions across the country, directly competing with other Blue plans. This increased competition would result in higher reimbursement rates for healthcare providers in those areas.

---

[8] *The Top Health Insurance Companies Dominating the U.S. Market*, THESTREET.COM, Jan. 17, 2025, *available at* https://www.thestreet.com/retirement-daily/your-money/top-health-insurance-companies-the-u-s-market (last accessed Feb. 27, 2025).

[9] *Our Story*, HIGHMARK.COM, https://www.highmark.com/about/our-story (last accessed Feb. 27, 2025).

[10] *Company Overview*, BCBSAL.ORG, https://www.bcbsal.org/web/about/overview.html#:~:text=We%20cover%20over%202.8%20million,and%20an%20additional%20840%2C000%20nationwide (last accessed Feb. 27, 2025).

116.    CareFirst Blue Cross and Blue Shield, which administers Blue plans in Maryland, Washington, D.C., and parts of Virginia, is the dominant healthcare insurer in the Mid-Atlantic region, with approximately 3.5 million enrollees.[11] If not for the territorial restrictions imposed by the Blues, CareFirst would likely expand its health insurance offerings to additional regions across the country, directly competing with other Blue plans. This increased competition would result in higher reimbursement rates for healthcare providers in those areas.

117.    BCBS-MA insures around 3 million members in its designated Service Area of Massachusetts. If not for the territorial restrictions imposed by the Blues, BCBS-MA would likely expand its health insurance offerings to additional regions across the country, directly competing with other Blue plans. This increased competition would result in higher reimbursement rates for healthcare providers in those areas.

118.    BCBS-FL, serves approximately 4.2 million members in Florida. In the absence of the territorial restrictions described above, BCBS-FL would likely expand its health insurance offerings to additional regions across the country, directly competing with other Blue plans. This increased competition would result in higher reimbursement rates for healthcare providers in those areas.

119.    BCBSA functions as a separate legal entity that claims to advocate for the collective interests of the Blues. It describes itself as "a national association of 33 independent, community-based, and locally operated BCBS companies" and refers to these 33 insurers as its Member Plans.

120.    BCBSA serves as the hub for communications and coordination among Defendants to uphold their agreements to work together and not to compete. In 2015, BCBSA announced that

---

[11] *About Us*, CAREFIRST.COM, https://member.carefirst.com/members/about-us/overview.page (last accessed Feb. 27, 2025).

every Blue agreed to participate in two data aggregating programs to better inform quality and cost decisions, specifically recognizing that, "[t]here's been a commitment from every [BCBS] CEO stepping up and providing data across every zip code."[12]

121.    The Blues control the Board of Directors of BCBSA. Every Blue is a member of BCBSA, and every Blue CEO sits on the BCBSA Board of Directors. Additionally, each Blue participates in multiple BCBSA Committees.

122.    The governance of BCBSA is entirely controlled by its member plans, which are all independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names. If not for agreements restricting competition, these companies would directly compete against one another in the commercial insurance market.

123.    As at least one federal court has recognized, BCBSA "is owned and controlled by the member plans" to such an extent that "by majority vote, the plans could dissolve the Association and return ownership of the Blue Cross and Blue Shield names and marks to the individual plans." *Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989).

124.    Pursuant to the BCBSA Bylaws, the Board of Directors consists of the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer. The current chairman of the board, Brian D. Pieninck, elected on November 15, 2023, is the president and chief executive officer of CareFirst BlueCross BlueShield. Additionally, BCBSA CEO Katie Keck, serving since 2021, is also the president and chief executive officer of Blue Cross & Blue Shield of Rhode Island.

---

[12] Scott Mace, *BCBS Ups Its National Data, Care Coordination Game*, Nov. 3, 2015, https://www.healthleadersmedia.com/innovation/bcbs-ups-its-national-data-care-coordination-game (last accessed Feb. 27, 2025).

125.     BCBSA is structured with numerous committees, all governed by the Defendants, and it organizes various meetings, seminars, and conferences attended by Defendants. BCBSA meetings serve as a forum for Defendant representatives to exchange information regarding the management of their companies and common health insurance concerns. This information is then disseminated among all 33 member plans. Additionally, BCBSA generates manuals, reports, listservs, and other communications for the Blues. All of these activities further facilitate the Defendants' conspiracy.

126.     The Blues exercise authority over BCBSA's Plan Performance and Financial Standards Committee ("PPFSC"), a standing committee within BCBSA's Board of Directors. The PPFSC is composed of nine CEOs from member Plans and three independent members.

127.     The Blues dictate the entry process for new BCBSA members. Pursuant to the BCBSA Bylaws, to be eligible for licensure, an applicant must receive a majority vote from BCBSA's Board and BCBSA seeks to ensure that a license to use the Blue Marks will not fall into the hands of a stranger the Association has not approved.

128.     The Blues also establish and enforce the rules and regulations that all BCBSA members must follow. These regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively referred to as the "License Agreements"), as well as the Membership Standards Applicable to Regular Members (the "Membership Standards") and the Guidelines to Administer Membership Standards (the "Guidelines").

129.     License Agreements stipulate that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans." Under these agreements, each plan is required to "comply with the Membership

Standards." The agreements explicitly state that the most recent amendments, if any, were adopted by member plans on November 16, 2023.

130.    The Guidelines specify that the Membership Standards and Guidelines were developed by the PPFSC and adopted by the Member Plans in November 1994, becoming effective on December 31, 1994. These Membership Standards "remain in effect until otherwise amended by the Member Plans," and any modifications require "a three-fourths or greater affirmative Plan and Plan weighted vote" for approval. Additionally, "new or revised guidelines shall not become effective . . . unless and until the Board of Directors approves them." The PPFSC is responsible for regularly reviewing the Membership Standards and Guidelines to ensure they remain appropriate, adequate, and enforceable.

131.    Compliance with BCBSA's rules and regulations is overseen by the Blues themselves. According to the Guidelines, the PPFSC is responsible for making the initial determination about a Plan's compliance with the license agreements and membership standards. Following this assessment, the PPFSC submits a recommendation to BCBSA's Board of Directors, which has the authority to accept, reject, or modify it. Additionally, the Guidelines mandate that BCBSA shall send a triennial membership compliance letter to each member Plan's CEO, which includes a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards. In response, the Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members.

132.    The Blues also manage and enforce disciplinary measures against BCBSA members that fail to comply with its regulations. The Guidelines outline three possible responses

to non-compliance: "Immediate Termination," "Mediation and Arbitration," and "Sanctions." Each of these measures is overseen by the PPFSC and can lead to the revocation of a member plan's license.

133.     The Blues exercise authority over the expulsion of members from BCBSA. Under the Guidelines, the PPFSC first assesses a Plan's compliance with license agreements and Membership Standards and then submits a recommendation to the BCBSA Board of Directors, which has the power to approve, reject, or amend it. However, the Guidelines also state that a member plan's licenses and membership in BCBSA may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote. Terminating a license agreement requires a "double three-quarters vote" by BCBSA member plans. This means that each plan votes twice— first, with all votes counted equally, and then again with votes weighted primarily according to the number of subscribers.

134.     The Blues are, in theory, competitors; however, they use their control over BCBSA to coordinate their operations. Consequently, the rules and regulations ostensibly imposed by BCBSA on its members are, in reality, imposed by the member plans on themselves.

135.     Each BCBSA licensee remains an independent legal entity. The formation of BCBSA did not alter the fundamental autonomy of the individual Blues, a position that BCBSA has never disputed. The License Agreements explicitly state that, "[n]othing contained in the Agreement shall be construed as creating a joint venture, partnership, agency or employment relationship between Plan and Controlled Affiliate or between either and BCBSA."

136.     The Blues initially established the BCBSA's precursor after realizing the need for national coordination.

137.    BCBSA functions as a tool that independent health insurance companies use to conspire, coordinate, and enter into agreements that restrict competition. Since BCBSA is both owned and controlled by its member plans, any agreement between BCBSA and a member plan effectively constitutes a horizontal agreement among those member plans.

138.    As outlined in this complaint, BCBSA not only engages in anticompetitive agreements with the Blues to allocate markets but also facilitates coordination and communication among Defendants to stifle competition. BCBSA serves as a convenient mechanism through which Defendants establish unlawful territorial restrictions between and among themselves.

## II.    THE BCBS MARKET ALLOCATION CONSPIRACY

139.    Defendants divide the health insurance market geographically by restricting each Defendant's operations to a specific Service Area. These restrictions shield each Defendant from competition by preventing other Blues from entering each's respective markets. The only purpose of these provisions is to eliminate competition, as they serve no legitimate economic function.

140.    By engaging in these anticompetitive practices, Defendants have gained market power, allowing them to underpay both in-network and out-of-network healthcare providers. Defendants directly compensate in-network providers based on provider agreements. However, due to their dominance in each of the exclusive geographical markets, providers like Plaintiffs have no real negotiating leverage when joining the Blue network. Payment terms for medical services are imposed on a take it or leave it basis, with little to no room for negotiation.

141.    Most Blues only pay out-of-network providers directly when state laws mandate it, such as in Tennessee and New Jersey. Otherwise, they refuse to honor assignment of benefits, requiring out-of-network providers to collect payment directly from patients. This tactic discourages providers from remaining out-of-network, as they must either bill patients upfront or

chase them for payment. By enforcing this policy, Defendants pressure providers to join their networks at below-market rates and retaliate against those who attempt to operate independently.

142.    To maintain their monopolistic control, Defendants deliberately structured the market to ensure each operates free from competition from other Blues. This was achieved through a licensing system that imposes geographic restrictions, limiting each Defendant's use of the Blue Cross and Blue Shield trademarks to an exclusive territory.

143.    Originally, Blue Cross and Blue Shield plans were separate entities, each created to address different healthcare coverage needs. Blue Cross plans, developed in collaboration with the American Hospital Association ("AHA"), were designed to cover hospital expenses. Meanwhile, Blue Shield plans emerged with the support of the American Medical Association ("AMA") to provide coverage for physician and other healthcare services.

144.    In 1946, nine independent Blue Shield plans formed the Associated Medical Care Plans ("AMCP"), as a national body intended to oversee and endorse independent Blue Shield plans. The AMCP rebranded itself as the National Association of Blue Shield Plans in 1960 and later became the Blue Shield Association in 1976.

145.    Historically, Blue Cross and Blue Shield plans operated as direct competitors. In their early years, no restrictions prevented a Blue Cross plan from offering coverage in a region already served by a Blue Shield plan, and vice versa.

146.    However, by the late 1940s, competition intensified from commercial insurance companies that recognized the Blues' success and sought to enter the market.

147.    Between 1947 and 1948, the Blue Cross Commission and the AMCP attempted to create a unified national entity, Blue Cross and Blue Shield Health Service, Inc., to consolidate all Blue plans under a single organization. However, the proposal ultimately failed, partly due to

concerns from the AMA that such coordination could lead to antitrust violations and potential legal challenges for restraint of trade.

148.     To counteract competition from commercial insurers—including rival Blue plans—and to promote national collaboration among the various Blue entities, the Blues decided to centralize the ownership of their trademarks and trade names.

149.     In 1954, Blue Cross plans transferred their rights to their respective Blue Cross trademarks and trade names to the AHA. In 1972, the AHA assigned these rights to the Blue Cross Association. Similarly, in 1952, Blue Shield plans agreed to transfer their ownership rights in their Blue Shield trademarks and trade names to the National Association of Blue Shield Plans, which was later rebranded as the Blue Shield Association in 1976.

150.     During the 1970s, the AHA and the Blue Cross Association merged, a process that culminated in the formation of the BCBSA by 1982.

151.     Between 1981 and 1986, Blue plans experienced an annual market share decline of approximately one percent. Simultaneously, competition intensified, both among Blue plans themselves and from their non-Blue subsidiaries.

152.     In September 1982, the BCBSA Board of Directors adopted a Long-Term Business Strategy, under which the Blues formally agreed not to compete with one another. At the time, BCBSA was aware that these agreements violated antitrust laws.

153.     In response to increasing competition, the Blues aimed to solidify national cooperation among their entities. As a result, they centralized control over their trademarks and trade names.

154.     At that time, BCBSA became the exclusive owner of the Blue Cross and Blue Shield trademarks and trade names.

155. Ultimately, the Blues reached an agreement to restrict the geographic areas in which both their Blue and non-Blue subsidiaries could operate, as well as to limit the ability of non-members of BCBSA to control or acquire member plans.

156. As part of this agreement, BCBSA established strict rules and regulations governing its members' licensing agreements and the requirements that potential new members must meet before joining. Any amendments to these regulations require approval by three-fourths of the member plans, with revisions occurring as recently as November 2023.

157. Under the terms of the License Agreements, each Blue plan agrees that neither it, nor its subsidiaries, will compete under the Blue Cross or Blue Shield trademarks outside of its designated geographic "Service Area." This designated area corresponds either to the territory served by the plan as of June 10, 1972, or to any subsequent regions granted through licensing agreements.

158. Under the Guidelines and Membership Standards, each member plan commits to ensuring that at least 80% of its annual revenue—excluding Medicare and Medicaid—generated within its designated Service Area comes from services provided under the Blue Cross and Blue Shield trademarks. Additionally, each Defendant agrees that at least two-thirds of the total revenue it or its subsidiaries generate, whether inside or outside its designated Service Area, excluding Medicare and Medicaid, must come from services associated with the Blue Cross and Blue Shield trademarks. The Guidelines also allow for national enrollment figures to be substituted for revenue, meaning a plan must ensure that at least two-thirds of its total national enrollment comes from Blue-branded services. These provisions restrict the ability of each Blue plan to generate revenue from non-Blue branded business and prevent them from developing alternative brands that could compete with other Blue entities.

159.    As a result, the Defendants have agreed that, in exchange for exclusive rights to use the Blue Cross Blue Shield brand within their assigned geographic regions, each Blue entity will not generate revenue under the Blue brand outside its designated area. Additionally, no more than one-third of a Blue plan's revenue can come from outside its exclusive territory under a non-Blue brand. This cap is further reduced if the licensee also earns revenue from non-Blue branded services within its designated Service Area.

160.    Elevance, formerly known as Wellpoint, acknowledged these restrictions in its February 17, 2011, Form 10-K filed with the U.S. Securities and Exchange Commission. The company stated that it had "no right to market products and services using the Blue Cross Blue Shield names and marks outside of the states in which we are licensed to sell Blue Cross Blue Shield products." The filing also confirmed that BCBSA's licensing agreements impose specific operational restrictions, including the requirement that at least 80% of a licensee's annual revenue from health benefit plans within its Service Area must be marketed, administered, or underwritten under the Blue Cross Blue Shield brand. Furthermore, at least two-thirds of a licensee's total national revenue from health benefit plans must be tied to the Blue Cross Blue Shield trademarks.

161.    The structure of BCBS, along with the longstanding relationships between its member plans, fosters an environment that facilitates implicit agreements that hinder competition.

162.    Beyond the restrictions established in the Licensing Agreements, Guidelines, and Membership Standards, the Blues have made additional agreements among themselves not to compete. For example, while the Licensing Agreements allow each Blue to expand into one county within an adjacent Defendant's territory, on information and belief, some of the Blues have voluntarily entered into informal agreements to refrain from competing in those areas. Additional side agreements further limited competition. Highmark BCBS was formed in 1996 through the

merger of two Pennsylvania-based BCBSA plans: Blue Cross of Western Pennsylvania, which controlled the Blue Cross license for 29 counties in Western Pennsylvania, and Pennsylvania Blue Shield, which held the Blue Shield license for the entire state.[13]

163.    Before this merger, Pennsylvania Blue Shield and Independence Blue Cross—the Blue Cross licensee for the five counties in Southeastern Pennsylvania—competed in the region through their respective subsidiaries. Pennsylvania Blue Shield launched Keystone Health Plan East, an HMO plan, in 1986. In response, Independence Blue Cross acquired Delaware Valley HMO and Vista Health Plan, both HMOs, to counter Keystone Health Plan East's presence in the market. In 1991, Pennsylvania Blue Shield and Independence Blue Cross agreed to merge their HMO operations under the Keystone Health Plan East brand, with Pennsylvania Blue Shield also acquiring a 50% stake in Independence's PPO, Personal Choice. However, when Blue Cross of Pennsylvania and Pennsylvania Blue Shield merged to create Highmark BCBS, Pennsylvania Blue Shield sold its shares in Keystone Health Plan East and Personal Choice to Independence Blue Cross. As part of the transaction, Pennsylvania Blue Shield—now operating as Highmark BCBS—agreed not to enter Southeastern Pennsylvania for a decade, even though it was fully licensed to compete under the Blue Shield brand throughout the state.

164.    On information and belief, the non-compete agreement between Highmark BCBS and Independence BC, which was set to expire in 2007, remains in effect. Rather than entering the Southeastern Pennsylvania market after the agreement's expiration, Highmark BCBS instead announced plans to merge with Independence BC. However, after a comprehensive review by the Pennsylvania Insurance Department, the merger application was withdrawn. At the time,

---

[13] *See Our Story*, HIGHMARK.COM, https://www.highmark.com/about/our-story (last accessed Feb. 27, 2025).

Pennsylvania Insurance Commissioner Joel Ario stated he was "prepared to disapprove this transaction because it would have lessened competition…to the detriment of the insurance buying public." Despite its prior competitive presence in Southeastern Pennsylvania, its statewide Blue Shield license, and its success in entering and thriving in Central Pennsylvania, the Lehigh Valley, West Virginia (through its affiliation with Mountain State Blue Cross Blue Shield), and Delaware (via its affiliation with Blue Cross and Blue Shield of Delaware), Highmark BCBS has made no effort to re-enter Southeastern Pennsylvania. This ongoing, unlawful agreement not to compete has stifled competition across Pennsylvania, including in Western Pennsylvania. Furthermore, Highmark has engaged in similar anti-competitive arrangements with other Blues in the state.

165.    The territorial restrictions imposed by the Blues, which limit their ability to generate revenue outside their assigned Service Areas, function as agreements to divide and allocate geographic markets. As such, they constitute *per se* violations of Section 1 of the Sherman Act.

166.    Many of the Blues, along with non-Blue businesses owned by Defendants, would be capable of competing in additional Service Areas if not for these territorial restrictions. Several factors demonstrate the likelihood of increased competition in the absence of such restraints.

a.      First, as previously mentioned, these restrictions were specifically designed to eliminate competition among Blues. If there was no real risk of competition, these measures would have been unnecessary. Initially, the restrictions did not apply to non-Blue subsidiaries of the Blues. However, as competition from these entities became an increasing issue, the restrictions were amended to curb this as well.

b.      Second, limited competition has been allowed in specific regions, illustrating that intra-Blue competition is possible. Although competition in these areas remains

constrained due to agreements preventing other Blues from entering, the fact that these companies coexist and operate effectively proves that competition between Blues does not weaken the brand or its trademarks.

c.      Third, some Blues have expanded beyond their original Service Areas through mergers with other Blues. For instance, Elevance, originally the Blue Cross licensee for California, now holds BCBSA licenses for 14 states. Before merging with WellPoint (now Elevance), Anthem initially held a BCBSA license for Indiana but expanded to become the licensee for eight states. If not for the current restrictions, Elevance would likely compete in additional Service Areas and could potentially operate on a national scale. Similarly, HCSC has expanded into new regions despite these constraints.

d.      Fourth, several Blues have demonstrated their willingness and ability to expand beyond their designated Service Areas in the absence of these restrictions. Elevance, for example, has entered markets where it is not authorized to operate under the Blue brand, initially through Unicare and more recently through its acquisition of Amerigroup. It has also established CareMore Centers in Arizona, despite not holding the Blue Cross Blue Shield license for that state. Similarly, Blue Cross Blue Shield of Michigan operates outside its home state through a division that provides Medicaid-managed care services. Other Blues have followed suit, extending into new territories where possible.

167.    However, these expansions and indica of competition remain highly restricted due to the territorial limitations imposed by the Licensing Agreement. As long as the Blues continue to adhere to these geographic constraints, genuine competition in the healthcare insurance market remains unattainable.

168.     As a result of the absence of competition, the Blues have gained substantial market power and dominance within their respective Service Areas. The territorial restrictions imposed by the Defendants have effectively blocked competition in the respective commercial health insurance markets as well as in the market for reimbursing healthcare providers.

169.     The BCBSA is responsible for enforcing compliance with these territorial restrictions and has the authority to impose severe penalties on any member that violates them. As outlined in the Guidelines, any licensee found breaching these restrictions may face "license and membership termination." Losing the Blue Cross and Blue Shield branding is a significant consequence.  According to Blue Cross Blue Shield Kansas's website, "The Blue Cross Blue Shield symbols and name are among the most recognized in America. Americans associate these symbols with high-quality affordable healthcare coverage. These brands represent high-quality, customer-focused, innovative and cost-effective companies."  Additionally, if a Member Plan is terminated, it must pay a financial penalty to BCBSA. According to Elevance's (formerly WellPoint) February 17, 2011 Form 10-K filing, the "re-establishment fee" was set at $98.33 per enrollee.

## III.     **THE BCBS PRICE FIXING CONSPIRACY**

170.     As a consequence of the Market Allocation Conspiracy, Defendants secured market dominance and suppressed healthcare provider reimbursement rates within their designated Service Areas. To capitalize on these artificially low provider payments, Defendants conspired to implement a Price Fixing Scheme through the national programs, including but not limited to the Blue Card Program, ensuring that these reduced rates benefited all Blues. The horizontal conspiracy also involves a concerted refusal to deal or collective boycott of Plaintiffs outside of each Blue's Service Area. Under the License Agreements, every Blue agrees to participate in each national program adopted by the Members.  Those national programs include: (i) Transfer

Program; (ii) Inter-Plan Teleprocessing System ("ITS"); (iii) Blue Card Program; (iv) National Accounts Programs; (v) National Associate Agreement for Blue Cross and Blue Shield Licenses effective April 14, 2003; and (vi) Inter-Plan Medicare Advantage Program.

171.    The Blues commit that, other than in contiguous areas, they will not contract, solicit or negotiate with providers outside of their Service Areas. In other words, each Blue agrees with all other Blues to boycott providers outside of their Service Areas.

172.    Defendants achieved the Price Fixing Conspiracy by agreeing that all Defendants would participate in the national programs including the Blue Card and National Accounts Programs, which determine the price and the payment policies to be used when a patient insured by a Blue or included in an employee benefit plan administered by a Defendant receives healthcare services within the Service Area of another Blue.

173.    The Defendant Blues implement the conspiracy collectively through the Inter-Plan Programs Committee ("IPPC") where a number of the Defendant Blues decide how the Blue Card Program along with other national programs are designed and implemented. The National Accounts Programs are implemented through horizontal agreements between the Blues as well as through the IPPC and the Blue Card Program.

174.    To effectuate the Blue Card Program, Defendants collectively agreed that all participating Blues would adhere to the Blue Card Program, which dictates the pricing structure and reimbursement policies applied when a patient covered by a Blue plan, or enrolled in an employee benefit plan administered by a Defendant, receives medical care in another Blue's Service Area. The Blue Card Program is most frequently used when employees (or their dependents) live in a different Service Area than their employer's headquarters. Additionally, it facilitates claims processing for Blue members seeking medical treatment while traveling.

Plaintiffs regularly provide care to patients insured by a Defendant or enrolled in an employee benefit plan administered by a Defendant outside its own Service Area.

175.    Within the Blue Card Program, the Blue through which the subscriber is enrolled is referred to as the "Home Plan." The logo of the Home Plan can be found on the member's BCBS insurance card. The Blue located in the Service Area where the medical service is provided is referred to as the "Host Plan."

176.    An "Out-of-Area-Insured" is an insured individual who is enrolled in a Blue Cross and Blue Shield plan other than the Host Plan.

177.    When an Out-of-Area Insured patient submits their claims to the local or Host Plan, the Host Plan then coordinates the claims process through the Blue Card Program.

178.    The Host Plan codes and prices the claim according to contracted provider agreements, then sends an electronic submission to the Home Plan.

179.    When the Home Plan receives the information, the claim is processed by applying the Plan's medical policy, claim adjudication edits, and the member's benefit exclusions or limitations. The BCBS Plan then sends an electronic disposition back to the Host Plan, with instructions for paying the claim according to the Host Plan fee-schedule. The Host Plan then generates a voucher, pays the claims, and notifies the Home Plan how the claim was paid.

180.    As a result of the BCBS Price Fixing Conspiracy, when Plaintiffs treat a patient enrolled in a Blue plan from another Service Area, Plaintiffs are unable to negotiate a separate agreement with that Defendant. Instead, the Home Plan reimburses Plaintiffs at the discounted rate established by the Host Plan through the Market Allocation Conspiracy.

181.    In sum, Defendants have collectively agreed to fix healthcare reimbursement rates within each Service Area. Consequently, Plaintiffs receive significantly lower payments for

treating patients insured by, or included in, employee benefit plans administered by a Blue from a different Service Area than it would in a competitive market. This Price Fixing Conspiracy constitutes a *per se* or rule of reason violation of Section 1 of the Sherman Act.

182. Beyond the financial harm caused by lower reimbursement rates, the Blue Card Program also imposes additional inefficiencies and administrative burdens on Plaintiffs. While the Host Plan sets the payment rates for medical services, the Home Plan dictates medical policies, claims processing rules, and coverage requirements. These policies and requirements often differ between Home and Host Plans, and healthcare providers in the Host Plan's Service Area may not have access to or be aware of them. These coverage rules include preauthorization and pre-notification requirements that must be met before the Plan will approve payment for services provided to its members.

183. As a result of the artificially suppressed reimbursement rates imposed by Defendants' Price Fixing Conspiracy, Plaintiffs received lower payments.

## IV.    OTHER ABUSES THAT PRESERVE THE BLUES' ENHANCED MARKET POWER

184. In addition to the harms previously stated, Plaintiffs suffered additional injuries as a result of Defendants' exploitation of their substantial market power.

185. The Blues include confidentiality clauses in contracts with Plaintiffs, prohibiting the disclosure of pricing terms among providers. By restricting the transparency of price terms of the contracts, Defendants actively suppress competition.

186. Moreover, Defendants require Plaintiffs to disclose the reimbursement rates they receive from other health insurance companies, while simultaneously refusing to disclose the rates they pay to other providers. This practice creates an imbalance of information in the healthcare

provider market, preventing fair competition and giving Defendants a distinct advantage in any negotiation that occurs between Defendants and providers.

187.    On information and belief, Defendants, have leveraged their massive and excessive financial reserves to pressure healthcare providers into accepting significantly below-market rates. Some Defendants have threatened to enter the market as a direct provider of healthcare services and, in some instances, have already done so. This strategy is intended to further depress provider reimbursement rates and create additional obstacles for competing firms attempting to enter these markets.

## V.    ANTITRUST INJURY

188.    Defendants' illegal activities have resulted in antitrust injury and harm to competition.

189.    Through their violations of the antitrust laws, Defendants have suppressed prices and competition depriving patients of choices in the marketplaces serviced by Plaintiffs.

190.    By definition, Defendants have harmed competition by virtue of their agreements in that they have agreed not to compete with one another in each of the Blue's Service Areas.

191.    Additionally, because most of the Blues are monopolists in the insurance market, in addition to monopsonists, it does not stand to reason that lower payment rates necessarily lower consumers' premiums. R. Hewitt Pate, a former Assistant Attorney General of the Antitrust Division, in a 2003 statement before the Senate Judiciary Committee, remarked:

> A casual observer might believe that if a merger lowers the price the merged firm pays for its inputs, consumers will necessarily benefit. The logic seems to be that because the input purchaser is paying less, the input purchaser's customers should expect to pay less also. But that is not necessarily the case. Input prices can fall for two entirely different reasons, one of which arises from a true economic efficiency that will tend to result in lower prices for final consumers. The other, in contrast, represents an efficiency- reducing exercise of market power that will reduce economic welfare, lower prices for

suppliers, and may well result in higher prices charged to final consumers.[14]

192.    In the long run, the Blues monopsony power gained by virtue of their unlawful agreements will harm consumers. Fewer healthcare professionals – in all practice areas and specialties - are practicing than would be practicing in a competitive market because of the lower than competitive prices the Blues pay.  A number of reports conclude that the United States already faces a critical shortage of physicians.[15]  Many providers are considering leaving the marketplace because of inadequate reimbursements paid by, and other burdens created by, Defendants. According to Doximity's 2023 Physician Compensation Report, more physicians are likely to leave their jobs as pay rates fall.  And, that same report showed, "that the average pay for doctors did not increase in 2022."[16]

193.    Further, consumer choices have been reduced with regard to facilities where medical and surgical procedures are performed as a result of the Blues' low payments.  Hospitals and other facilities are closing. Other facilities are reducing services offered to consumers. Still others that would otherwise expand are not doing so as a result of the Blues' low payments.

194.    In addition, Plaintiffs suffer because agreements not to compete also restrict their choices in the market.

---

[14] Antitrust Enforcement in the Agricultural Marketplace, Hearing Before the Senate Jud. Comm., 108th Cong. (2003), *available at* https://www.justice.gov/sites/default/files/atr/legacy/2015/05/05/201430.pdf (last accessed Feb. 27, 2025).

[15] Mark Koba, *Doctor Shortage Getting Worse*, CNBC.COM, Mar. 13, 2013, *available at* https://www.cnbc.com/2013/03/13/doctor-shortage-getting-worse.html, documenting a shortage of 16,000 primary care physicians (last accessed Feb. 26, 2025).

[16] *The 2023 Physician Compensation Report*, DOXIMITY, https://press.doximity.com/reports/doximity-physician-compensation-report-2023.pdf (last accessed Feb. 26, 2025).

195.    Defendants' illegal activities have resulted in harm to competition. Moreover, Defendants' activities have been undertaken with the aim of forcing Plaintiffs to choose between non-competitive rates or being put out of business through coercion.

196.    Defendants' illegal activities have also resulted in antitrust injury to Plaintiffs, including lost revenues resulting from decreased use of Plaintiffs' services and facilities, and threatened future harm to Plaintiffs' business and property.

197.    Since at least July 24, 2008, Plaintiffs have been subject to artificially suppressed reimbursement rates and reduced competitive opportunities. These ongoing injuries have persisted through the present, continuing to harm Plaintiffs and restrict competition in the United States healthcare market.

198.    If Defendants' actions are not enjoined, harm to competition and injury to Plaintiffs will continue.

## VI.    DEFENDANTS, EVEN THOSE ORGANIZED AS NOT FOR PROFIT, REAP SUPRA-COMPETITIVE PROFITS

199.    The Defendants' anticompetitive conduct has enabled them to generate excessive profits. Without competition, they have been able to significantly underpay the Plaintiffs for medical and surgical services provided to patients covered under their insurance plans or administered policies. This cost reduction has led to notably higher profit margins and/or financial surpluses than they would have been able to achieve in a competitive market. Indicators of these excessive profits include high underwriting margins and surpluses that exceed statutory requirements.

200.    Although the Blues were originally founded as nonprofit entities, they eventually began operating like for-profit corporations. In 1986, after Congress revoked their tax-exempt status, they established for-profit subsidiaries. Many of these entities later transitioned to for-profit

status and continue to operate as such today. Those that remain nominally nonprofit still amass considerable earnings and surpluses, with their executives receiving millions in salaries and bonuses.

201.    Blues across the country share common practices that extend throughout their network. Executives exchange information on concealed expense schemes, allowing them to benefit from hidden increases in salaries, bonuses, travel perks, and excessive medical claim benefits. These perks not only provide personal advantages for management but also artificially inflate corporate expenses to further benefit company executives.

202.    Some Blue executives make it even more difficult to scrutinize excessive expenditures by misrepresenting expenses as meaningful or charitable services. Substantial lobbying fees and campaign contributions made by affiliated "charitable foundations" are often intended to maintain lax regulatory oversight.

203.    On information and belief, some of the Defendants have engaged in self-dealing through affiliated entities. Additionally, some of the Defendants have engaged in unfair cost allocations, preferential medical benefits for executives and politicians, and reimbursing campaign contributions through bonus adjustments.

204.    The intricate web of self-dealing and interconnected affiliated companies makes it exceedingly difficult for those interacting with the Defendants to determine whether they are being treated fairly or exploited by these so-called "charitable non-profit" organizations.

205.    For example, Defendants frequently impose undisclosed "hidden fees" on long-standing customers. These fees include "retained" amounts that are not allocated toward covering medical claims but are instead kept by the company or one of its affiliates. Blue Cross of Michigan

was recently found liable for $5 million in damages for breaching its ERISA obligations to one of the health plans it administers.[17]

206.    Moreover, despite branding themselves as "not-for-profit," many Blues amass excessive financial reserves by leveraging the gap between the high premiums they charge consumers and the below-market reimbursement rates they pay healthcare providers. In a study conducted in 2010 of the "nonprofit" Blues, it was found that seven out of ten held more than three times the amount of surplus that regulations consider to be the minimum for solvency protection. For example, at the end of 2009, BCBS of Arizona had a surplus of more than seven times the regulatory minimum and HCSC had five times the regulatory minimum. Meanwhile, over the trailing three years, both insurers continued to raise rates.

207.    Many of the Blues significantly downplay their actual financial reserves by reporting only the surplus from their primary entity while omitting the broader general reserves detailed in their combined financial statements, which account for all business lines.

208.    For example, in South Carolina, Blue Cross Blue Shield's net income has risen sharply, even though its membership has grown only modestly, according to data from the state Department of Insurance.

209.    The Board of South Carolina Blue Cross Blue Shield, composed of influential attorneys, bankers, and business leaders, received compensation ranging from approximately $100,000 to $160,000 in 2010 for minimal responsibilities, primarily attending occasional meetings.

---

[17] *See* Bob Herman, *More Hidden Fees Alleged at BCBS of Michigan*, AXIOS.COM, Feb. 19, 2019, *available at* https://www.axios.com/2019/02/22/blue-cross-blue-shield-michigan-hidden-fees-lawsuit (last accessed Feb. 26, 2025).

210. Health Care Service Corporation, which oversees several Blues, including in Illinois, earned nearly $1.5 billion in profits in 2022 while BCBS of Alabama quadrupled its profits that same year. Likewise, in 2021, Blue Cross Blue Shield of Michigan reported a net income of $360 million.

211. These supra-competitive profits are a direct result of the Defendants' anti-competitive agreements, the price-fixing structure of the Blue Card program, and their market dominance—especially their ability to compel Plaintiffs into their networks at below-market rates. A spokesperson for Blue Cross of South Carolina even justified the plan's drastic price increases as a reflection of its "superior networks." This market power enables the Blues to reimburse Plaintiffs at rates far below competitive levels, resulting in massive surplus profits for entities that claim to operate as non-profit or charitable organizations.

212. If Defendants' actions are not enjoined, harm to competition and injury to Plaintiffs will continue.

**VII.  STATUTE OF LIMITATIONS AND TOLLING**

213. Plaintiffs' claims are timely under the tolling rule established in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and its progeny. The statute of limitations began tolling on July 24, 2012, when the first provider class action was filed. *See Conway v. Blue Cross and Blue Shield of Alabama et al*, Case No. 2:12-CV-02532 (N.D. Ala.).

214. Plaintiffs were included within the scope of this first-filed provider class action, which asserted substantially similar antitrust claims against BCBSA and its member plans, based on the same market allocation and price-fixing conspiracy at issue in this lawsuit.

215. The provider case was later consolidated into *In re Blue Cross Blue Shield Antitrust Litigation*, MDL No. 2406 (N.D. Ala.), where tolling continued throughout the pendency of the provider track proceedings.

216. Even if Plaintiffs' claims were not tolled by the provider class action, Defendants' market allocation and price-fixing conspiracy is ongoing and continues to harm Plaintiffs through suppressed reimbursement rates and restricted competition in its operating markets.

217. Each underpayment to Plaintiffs is a new overt act that restarts the statute of limitations, making these claims timely.

218. Defendants actively enforce their agreements through the Blue Card Program and exclusive Service Area restrictions, preventing Plaintiffs from negotiating competitive rates.

219. Plaintiffs' claims further remain timely under the continuing violation doctrine, as Defendants' anticompetitive conduct did not cease and continues to this day.

## CLAIMS FOR RELIEF

### COUNT I

**Contract, Combination, or Conspiracy in Restraint of Trade**
**in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**
**(The *Per Se* BCBS Market Allocation Conspiracy)**

220. Plaintiffs incorporate the allegations set forth in the foregoing paragraphs of this Complaint as though set forth fully herein.

221. The License Agreements, Membership Standards, and Guidelines entered into between BCBSA and the Blues represent a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

222. Through the License Agreements, Membership Standards, and Guidelines, BCBSA, and the Blues have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the BCBSA members. As a direct result of this market allocation scheme, the Blues face no competition from other Blues in each other's Service Areas and are therefore able to increase their profits by suppressing reimbursement rates paid to Plaintiffs in violation of Section 1 of the Sherman Act. The market

allocation agreement prevents Plaintiffs from contracting with or negotiating competitive rates with any other Blue entities operating outside of their Service Areas. Defendants' market allocation agreements are *per se* illegal under Section 1 of the Sherman Act.

223. As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have with increased competition and but for Defendants' anticompetitive agreement.

224. Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

225. Defendants' unlawful conduct threatens to continue to injure Plaintiffs. Plaintiffs seek a permanent injunction prohibiting Defendants from entering into, or from honoring or enforcing, any agreements that restrict the territories in which any of the Blues may compete in the commercial health insurance market.

## COUNT II

### Contract, Combination, or Conspiracy in Restraint of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (The *Per Se* BCBS Price Fixing Conspiracy)

226. Plaintiffs incorporate the allegations set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

227. The BCBS Price Fixing Conspiracy, in addition to the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and the Blues, represents a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act.

228.     Through the BCBS Price Fixing Conspiracy, the Blues have agreed to fix reimbursement rates for providers among themselves by agreeing to accept the "Host Plan" reimbursement rate through the national programs, such as the Blue Card Program. By so doing, Defendants have agreed to suppress competition by fixing and maintaining the rates paid to Plaintiffs at less than competitive levels in violation of Section 1 of the Sherman Act. Defendants' price fixing agreement through the national programs, such as the Blue Card Program is *per se* illegal under Section 1 of the Sherman Act.

229.     As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have with increased competition and but for Defendants' anticompetitive agreement.

230.     Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

231.     Defendants' unlawful conduct threatens to continue to injure Plaintiffs. Plaintiffs seek a permanent injunction prohibiting Defendants from entering into, or from honoring or enforcing, any agreements that fix the prices paid by Defendants for services rendered by Plaintiffs.

### COUNT III

**Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1
(The Rule of Reason Claims for the BCBS Market Allocation Conspiracy)**

232.     Plaintiffs incorporate the allegations set forth in foregoing paragraphs of this Complaint as though fully set forth herein.

233. Plaintiffs plead in the alternative that, Defendants' Market Allocation Conspiracy violates Section 1 of the Sherman Act under a rule of reason analysis and gives rise to damages to Plaintiffs in markets throughout the country.

234. As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

235. Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

236. Defendants' unlawful conduct threatens to continue to injure Plaintiffs. Plaintiffs seek a permanent injunction prohibiting Defendants from entering into, or from honoring or enforcing, any agreements that restrict the territories in which any of the Blues may compete in the commercial health insurance market.

## COUNT IV

### Contract, Combination, or Conspiracy in Restraint of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (The Rule of Reason Claims for the BCBS Price Fixing Conspiracy)

237. Plaintiffs incorporate the allegations set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

238. Defendants Price Fixing Conspiracy violates Section 1 of the Sherman Act and gives rise to damages to health care providers in geographic markets throughout the country.

239. As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type

that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

240.    Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

241.    Defendants' unlawful conduct threatens to continue to injure Plaintiffs. Plaintiffs seek a permanent injunction prohibiting Defendants from entering into, or from honoring or enforcing, any agreements that fix the prices paid by Defendants for services rendered by Plaintiffs.

## COUNT V

**Monopsonization**
**in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

242.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

243.    Defendants have engaged in conduct by which they have created or maintained monopsony power in the relevant product markets and geographic markets. For purposes of this Count, these Defendants are the ones having a market share of 70% or more in at least one geographic area. This monopsony power has been durable, lasting for decades.

244.    These Defendants' creation of monopsony power was willful. An express purpose of the Defendants' conduct was to prevent the Defendants from competing with each other, and thus interfering with each other's monopsony power.

245.    By willfully creating or maintaining monopsony power, these Defendants have violated Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part

of the trade or commerce among the several States." Section 2 has been held to prohibit monopsonization as well.

246.    As a direct and proximate result of Defendants' continuing violations of Section 2 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have with increased competition and but for Defendants' anticompetitive agreement.

## COUNT VI

### Attempted Monopsonization
### in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

247.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

248.    Defendants have engaged in conduct by which they have attempted to create or maintain monopsony power in the relevant product markets and geographic markets. For purposes of this Count, these Defendants are the ones having a market share of 40% or more in at least one geographic area. This monopsony power has been durable, lasting for decades.

249.    These Defendants specifically intended to create monopsony power. An express purpose of the Defendants' conduct was to prevent the Defendants from competing with each other, and thus interfering with each other's attempts to create monopsony power.

250.    By attempting to create or maintain monopsony power, these Defendants have violated Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Section 2 has been held to prohibit

monopsonization as well. Even when the Defendants have not yet created or maintained monopsony power, their conduct has created a dangerous risk of success.

251.    As a direct and proximate result of Defendants' continuing violations of Section 2 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have with increased competition and but for Defendants' anticompetitive agreement.

**COUNT VII**

**Conspiracy to Monopsonize
in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

252.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

253.    Defendants have agreed to restrict competition among themselves in the relevant product markets and geographic markets described above, and thus to create monopsony power. Defendants specifically intended to create monopsony power. An express purpose of their agreements was to prevent the Defendants from competing with each other, and thus interfering with each other's attempts to create monopsony power. All Defendants have taken overt acts in furtherance of this conspiracy by signing the various agreements that restrict competition among them. This conspiracy has affected a substantial amount of interstate commerce.

254.    By conspiring to create or maintain monopsony power, Defendants have conspired to violate Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any

part of the trade or commerce among the several States." Section 2 has been held to prohibit monopsonization as well.

255.    As a direct and proximate result of Defendants' continuing violations of Section 2 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have with increased competition and but for Defendants' anticompetitive agreement.

## REQUEST FOR RELIEF

256.    WHEREFORE, Plaintiffs request that this Court:

a.      Adjudge and decree that Defendants have violated Section 1 of the Sherman Act;

b.      Permanently enjoin Defendants from entering into, or from honoring or enforcing, any agreements that restrict the territories in which any Blue may compete in the commercial insurance market;

c.      Permanently enjoin Defendants from utilizing the Blue Card Program to pay Plaintiffs and from developing any other program or structure that is intended to or has the effect of fixing prices paid to Plaintiffs;

d.      Award Plaintiffs damages in the form of three times the amount of damages suffered by Plaintiffs as proven at trial;

e.      Award costs and attorneys' fees to Plaintiffs;

f.      Award prejudgment interest;

g.    For a trial by jury; and

h.    Award any such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

DATED: March 4, 2025        Respectfully submitted,

**PEARSON WARSHAW, LLP**

By:        */s/ Daniel L. Warshaw*

             DANIEL L. WARSHAW

DANIEL L. WARSHAW (Bar No. 185365)
  *dwarshaw@pwfirm.com*
BOBBY POUYA (Bar No. 245527)
  *bpouya@pwfirm.com*
MICHAEL H. PEARSON (Bar No. 277857)
  *mpearson@pwfirm.com*
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone:    (818) 788-8300
Facsimile:    (818) 788-8104

*Attorneys for Plaintiffs*